USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 97-1556 LEO VARTANIAN, Plaintiff - Appellant, v. MONSANTO COMPANY, ET AL., Defendants - Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Michael A. Ponsor, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Lynch, Circuit Judge, _____________ and Stearns,* District Judge. ______________ _____________________ John C. Sikorski, with whom Robinson Donovan Madden & Barry, ________________ ________________________________ P.C. was on brief for appellant. ____ Richard J. Pautler, with whom Peper, Martin, Jensen, Maichel __________________ ______________________________ and Hetlage, Francis D. Dibble, Jr. and Bulkley, Richardson and ___________ _______________________ _______________________ Gelinas were on brief for appellees. _______ ____________________ December 15, 1997 ____________________  ____________________ * Of the District of Massachusetts, sitting by designation. STEARNS, District Judge. This appeal involves a STEARNS, District Judge. _______________ question of first impression in this circuit, namely, the standard to apply in determining when an employer's consideration of an employee severance program gives rise to a fiduciary duty of disclosure under the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001-1461 ("ERISA"). Plaintiff-Appellant Leo Vartanian alleges that his former employer, Monsanto Chemical Company ("Monsanto"), misled him by failing to respond adequately to his inquiries about a severance package that was under internal corporate consideration when he retired from the company on May 1, 1991. A benefits package for which Vartanian would have otherwise been eligible was approved by the Monsanto Board of Directors on June 28, 1991. Vartanian filed a complaint against Monsanto in 1992 alleging two counts of breach of fiduciary duty under ERISA, one count of unlawful discrimination in violation of 510 of ERISA, and one count of common law negligent misrepresentation. The district court, Ponsor, J.,1 granted Monsanto's motion to dismiss the action on the grounds that, having taken a lump sum distribution of all the vested benefits to which he was entitled, Vartanian could not qualify as a "plan participant" with standing to assert ERISA violations. Vartanian v. Monsanto Co., 822 F. _________ ____________ Supp. 36, 41 (D. Mass. 1993). This Court reversed, holding, inter alia, that because Vartanian was a plan member at the time  ____________________ 1 Judge Ponsor was at the time a Magistrate Judge. He took office as a District Judge on March 14, 1994. -2- the alleged misrepresentations were made, he had standing to sue under ERISA. Vartanian v. Monsanto Co., 14 F.3d 697, 703 (1st _________ _____________ Cir. 1994)(Vartanian I). _________ On remand Judge Ponsor dismissed Vartanian's claim that Monsanto had breached an ERISA duty by failing to disclose its prospective plans to reduce staffing, but permitted the claims of misrepresentation about the possibility of an early retirement incentive plan to proceed. Vartanian v. Monsanto Co., 880 F. _________ ____________ Supp. 63, 70-71 (D. Mass. 1995). After discovery, Judge Ponsor granted Monsanto's motion for summary judgment, holding that because no enhanced severance package that would have affected Vartanian was under "serious consideration" at the time he retired, no actionable misrepresentation had been made. Vartanian v. Monsanto Co., 956 F. Supp. 61, 66 (D. Mass. 1997). _________ ____________ We affirm. I. I Our review of a motion for summary judgment is de novo. Associated Fisheries of Maine, Inc. v. Daley, ___ F.3d ___, ___, ___________________________________ _____ No. 97-1327, 1997 WL 563584 at *3 (1st Cir. Sept. 16, 1997). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Inferences are drawn in the light most favorable to the nonmoving party. Reich v. John Alden Life Ins. Co., 126 F.3d 1, _____ ________________________ -3- 6 (1st Cir. 1997). The nonmovant may not, of course, defeat a motion for summary judgment on conjecture alone. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). ________ ___________________ The following undisputed material facts are drawn from the parties' Joint Statement of Stipulated Facts, Defendant- Appellee Monsanto's Statement of Undisputed Facts, and Plaintiff- Appellant Vartanian's Response to Defendant's Statement of Undisputed Facts. After thirty-six years at Monsanto, Vartanian in December 1989 announced his intention to retire on January 1, 1991 (later amended to May 1, 1991). Vartanian was then employed at Monsanto's plastics facility at Indian Orchard, Massachusetts. Vartanian elected to take a lump sum distribution of his Salaried Employee's Pension Plan benefits. During past restructurings of its business, Monsanto had offered early retirement incentives, sometimes on a company-wide basis and sometimes to specific groups of employees. During 1990 and 1991, Monsanto's sales stagnated and net income shrunk. Rumors began circulating among Monsanto employees that the company was pondering an early retirement program as a cost-cutting device. These intensified when in October of 1990 Monsanto Agricultural Company (a separate Monsanto operating unit) offered a severance program to some of its employees as part of a reorganization plan. In the first -4- quarter of 1991, Robert Potter, the president of Monsanto, began discussing with his senior managers various proposals to streamline operations at Monsanto Chemical. These included the closing of several plants, but not the Indian Orchard facility where Vartanian worked. No plans were drawn up to implement a severance package,2 although Frank Reining, Monsanto's vice- president of finance, prepared an estimate of the cost of offering severance benefits to some 400 hypothetical employees. In March of 1991, Vartanian asked Charles Eggert, his immediate supervisor, if the rumors about an early retirement plan were true. After investigating, Eggert reported to Vartanian that Monsanto was not contemplating any severance program for which he would be eligible. On March 25, 1991, Vartanian and his wife executed an Affidavit, General Release, and Agreement in anticipation of the release of the lump sum benefits. During the week of April 15-21, 1991, after gossip about a possible severance plan revived, Vartanian contacted both Eggert and Lori Heffelfinger, the personnel representative for his employee group. Eggert and Heffelfinger told Vartanian that they had been unable to confirm the rumors, and did not personally believe that any early retirement package was in the  ____________________ 2 Vartanian asserts that any downsizing discussions would inferentially have involved the issue of severance benefits because of Monsanto's record of offering such incentives as part of past restructuring.  -5- works. Vartanian does not dispute the truthfulness of either statement. Between April 21 and May 1, 1991, the Monsanto Management Board met six times, eventually deciding to recommend to the Board of Directors the closure of six plants. No presentation concerning early retirement incentives was made at any of these meetings, and no document analyzing or proposing a severance program was prepared. Three alternate plans were drawn up for restructuring Monsanto's multiple product lines. None of the product lines in Vartanian's Plastics Division was recommended for discontinuance. Vartanian retired on May 1, 1991. On May 7, 1991, Potter met with the Monsanto Executive Management Committee, which endorsed in principle his proposal to restructure the company. On May 16, 1991, John Manns, the director of employee benefits, was asked to develop a severance program for potentially impacted employees. Manns asked Monsanto's actuaries, Towers, Perrin, Forster & Crosby ("TPF&C"), to gather the necessary data. On May 24, 1991, Manns gave TPF&C an outline of his proposal. On May 28, 1991, Manns met with Robert Abercrombie, the corporate benefits director, and Barry Blitstein, a corporate vice president, to discuss a concrete severance plan. It was at this meeting that the idea of extending an offer of early retirement to all Monsanto employees was first raised. -6- Coincidentally, on May 28, 1991, a St. Louis-based Plastics Division employee who had decided to retire on June 1, 1991, was assured by letter that he would receive the value of any increase in benefits if an early retirement program for which he would otherwise have been eligible was adopted within three months of his retirement date. On June 12, 1991, another St. Louis-based Plastics Division employee who planned to retire on July 1, 1991, was given a similar written assurance. Both employees were eventually paid the additional benefits from Monsanto's corporate treasury. On June 3, 1991, Monsanto's Executive Management Committee endorsed the idea of a company-wide early retirement program, and authorized further development work on the project. Potter told his division managers that they were to make the final decision whether to offer the program to their respective employees. John Tuley, the manager of Vartanian's division, decided not to participate. Tuley's decision was reversed by his successor, Arthur Fitzgerald, in mid-June of 1991. The retirement plan was finalized on June 27, 1991, and approved by Monsanto's Board of Directors on June 28, 1991. Had Vartanian been eligible to participate, he would have received an additional $174,700 in pension benefits.3 II. II. Although this Court, in Vartanian I, stated that _________  ____________________ 3 It is unclear whether Vartanian would have qualified for a lump sum distribution had he chosen the early retirement option. -7- Monsanto had "a fiduciary duty not to mislead Vartanian as to the prospective adoption of a plan under serious consideration," 14 F.3d at 702, it had no occasion to reach the question of what exactly constitutes "serious consideration." The district court on remand adopted the standard espoused by the Third Circuit in Fischer v. Philadelphia Elec. Co., 96 F.3d 1533 (3d Cir. _______ ________________________ 1996)(Fischer II), cert. denied, 117 S. Ct. 1247 (1997), that _______ ____________ serious consideration obtains when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." 956 F. Supp. at 66 (quoting Fischer II, 96 F.3d at 1539). Finding that _______ "[t]he undisputed facts reveal that none of this occurred at Monsanto until weeks after plaintiff retired," 956 F. Supp. at 66, Judge Ponsor granted Monsanto's motion for summary judgment. Id. at 67. ___ Monsanto urges us to follow the lead of the district court and adopt the Fischer II test. Vartanian asks for a more _______ flexible standard loose enough to fit the facts of his case. For reasons that will be explained, we prefer the Fischer II _______ approach.4  ____________________ 4 We are aware that some courts of appeals have recognized the possibility of an affirmative duty to advise a beneficiary of potential plan changes, regardless of the existence of employee inquiry. Antweiler v. American Elec. Power Serv. Corp., 3 F.3d _________ _________________________________ 986, 991 (7th Cir. 1993); Eddy v. Colonial Life Ins. Co., 919 ____ _______________________ F.2d 747, 750 (D.C. Cir. 1990); but see Pocchia v. NYNEX, 81 F.3d ___ ___ _______ _____ 275, 278 (2d Cir.), cert. denied, 117 S. Ct. 302 (1996)("[A] _____________ fiduciary is not required to voluntarily disclose changes in a benefit plan before they are adopted."). This issue, however, is not before us. -8- A. A. It has been said that employers who offer benefit plans wear "two hats," because of the "distinction between an employer s prerogative to initiate discretionary policy decisions such as creating, amending, or terminating a particular plan as compared to its fiduciary responsibilities to administer an existing plan for the benefit and interests of its participant- employees." Drennan v. General Motors Corp., 977 F.2d 246, 251 _______ ____________________ (6th Cir. 1992). When a prospective change in a benefit plan will adversely impact some or all plan participants, tension often arises between the employer s fiduciary obligations to its employees and its institutional desire to keep its internal deliberations confidential. This conflict is, in many respects, an inherent feature of ERISA.5 As one district court has observed, "[w]hen acting on behalf of the pension fund, there is no doubt that [the employer] must act solely to benefit participants and beneficiaries. However, . . . . the mere fact that a company has named itself as pension plan administrator or trustee does not restrict it from pursuing reasonable business behavior . . . ." Sutton v. Weirton Steel Div. of Nat'l Steel ______ __________________________________ Corp., 567 F. Supp. 1184, 1201 (N.D.W.Va.), aff'd, 724 F.2d 406 _____ _____  ____________________ 5 The conflict has generated a fair amount of scholarly comment. See Mary O. Jensen, Separating Business Decisions and Fiduciary ___ ____________________________________________ Duty in ERISA Litigation?, 10 BYU J. Pub. L. 139 (1996); Steven __________________________ Davi, To Tell the Truth: An Analysis of Fiduciary Disclosure __________________________________________________________ Duties and Employee Standing to Assert Claims under ERISA, 10 St. _________________________________________________________ John's J. Legal Comment. 625 (1995); Edward E. Bintz, Fiduciary _________ Responsibility under ERISA: Is There Ever a Fiduciary Duty to _________________________________________________________________ Disclose?, 54 U. Pitt. L. Rev. 979 (1993). _________ -9- (4th Cir. 1983). We are called upon in this case to delineate the point at which one form of reasonable employer behavior, namely the confidential consideration of an employee severance proposal, is overbalanced by the corresponding fiduciary duty imposed by ERISA. Early decisions grappling with the employer's duties in this context focused mainly on the extent of the cause of action engendered by an employer's material misrepresentations regarding prospective changes in plan benefits. See Maez v. Mountain ___ ____ ________ States Tel. & Tel., Inc., 54 F.3d 1488 (10th Cir. 1995); ____________________________ Vartanian I, 14 F.3d at 703; Fischer v. Philadelphia Elec. Co., _________ _______ ______________________ 994 F.2d 130 (3d Cir. 1993)(Fischer I); Berlin v. Michigan Bell _______ ______ _____________ Tel. Co., 858 F.2d 1154 (6th Cir. 1988). As a consensus on that ________ issue developed, attention began to shift to the question of when the consideration of a change in benefits reached a point of seriousness sufficient to trigger a fiduciary duty of disclosure. See Hockett v. Sun Co., Inc., 109 F.3d 1515, 1522-24 (10th Cir. ___ _______ _____________ 1997); Muse v. I.B.M., 103 F.3d 490, 493-94 (6th Cir. 1996), ____ ______ cert. denied, 117 S. Ct. 1844 (1997); Fischer II, 96 F.3d at _____________ _______ 1538-41. Vartanian urges us to reject the Fischer II test, _______ ostensibly because it is too deferential to an employer's corporate interests. Citing Varity Corp. v. Howe, 116 S. Ct. ____________ ____ 1065 (1996), Vartanian advocates a more diffuse test of when corporate deliberations achieve the level of "serious consideration." But he fails to suggest much by way of content -10- for his proposed test. It is true that Varity Corp. reaffirms ____________ the common law principle that a fiduciary must discharge its duties "with respect to a plan solely in the interest of the participants and beneficiaries." 116 S. Ct. at 1074 (quoting ERISA 404(a), 29 U.S.C. 1104(a)). Varity Corp.'s relevance to ____________ the facts of this case, however, is questionable. In Varity ______ Corp., the employer deliberately misled its employees about the _____ actuarial soundness of a benefit plan to induce them to transfer to a new division which had been tacitly created for the purpose of consolidating the company's money losing ventures. Id. at ___ 1068-70. Because of the deception, the Court determined that it "need not reach the question of whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries." Id. at 1075. ___ Vartanian proposes that, in the alternative, we adopt the multiple factors test used by the Second Circuit to analyze the materiality of an employer's misleading statements in Ballone _______ v. Eastman Kodak Co., 109 F.3d 117, 125 (2d Cir. 1997). These __________________ factors include "[h]ow significantly [the false] statement misrepresent[ed] the present status of internal deliberations regarding future plan changes, the special relationship of trust and confidence between a plan fiduciary and beneficiary, . . . and the specificity of the assurance." Id. (citations omitted). ___ Ballone, however, is also inapposite. Although the district _______ court in Ballone, like the district court here, dismissed ERISA _______ claims because of the lack of any evidence of "serious -11- consideration," 109 F.3d at 122, the complaint in Ballone _______ alleged that the employer falsely informed the inquiring plaintiff that the company had decided not to offer an early retirement plan for at least two years. Id. at 121. It seems ___ reasonable that where an allegation of positive misrepresentation is involved, that "aspect of the assurance can render it material regardless of whether future changes are under consideration at the time the misstatement is made." Id. at 124. We are not here ___ presented with facts that suggest a deliberate attempt on Monsanto's part to affirmatively mislead Vartanian, and therefore have no occasion to consider whether we would apply Ballone in an _______ appropriate case. It is true that in considering the scope of ERISA fiduciary duties, we are counseled "to apply common-law trust standards [while] 'bearing in mind the special nature and purpose of employee benefit plans.'" Varity Corp., 116 S. Ct. at 1075 ____________ (quoting H.R. Conf. Rep. No. 93-1280, at 302, 3 Legislative History of the Employee Retirement Income Security Act of 1974 at 4569 (1976)). The common law impresses on a trustee the duty to give a beneficiary "upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property . . . ." Restatement (Second) of Trusts 173 (1957). "[T]he beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust." Id. at ___ cmt. c. Any application of trust principles in an ERISA context -12- must, however, as the Supreme Court cautioned in Varity Corp., be ____________ tempered by a scrupulous regard for the delicate balance Congress struck in enacting ERISA. [C]ourts may have to take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering . . . benefit plans in the first place.  Varity Corp., 116 S. Ct. at 1070. ____________ The Third Circuit, in our view, carefully reconciled these competing concerns in shaping the Fischer II test.  _______ The concept of "serious consideration" recognizes and moderates the tension between an employee's right to information and an employer's need to operate on a day-to-day basis. Every business must develop strategies, gather information, evaluate options, and make decisions. Full disclosure of each step in this process is a practical impossibility. Moreover . . . large corporations regularly review their benefit packages as part of an on-going process of cost-monitoring and personnel management. . . . A corporation could not function if ERISA required complete disclosure of every facet of these on-going activities. . . . Equally importantly, serious consideration protects employees. Every employee has a need for material information on which that employee can rely in making employment decisions. Too low a standard could result in an avalanche of notices and disclosures. . . . [T]ruly material information could easily be missed if the flow of information was too great. The warning that a change in benefits was under serious consideration would become meaningless if cried too often. Fischer II, 96 F.3d at 1539. _______ -13- The Third Circuit concluded that "[s]erious consideration of a change in plan benefits exists when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement that change." Id.6 Notably important to the Fischer ___ _______ II court was the effect that a less definite standard might have on the availability of employee severance packages. Finally, as a matter of policy, we note that imposing liability too quickly for failure to disclose a potential early retirement plan could harm employees by deterring employers from resorting to such plans. Our formulation avoids forcing companies into layoffs, the primary alternative to retirement inducements. This further protects the interests of workers. Id. at 1541 (internal citations omitted). ___ Those of our sister circuit courts that have addressed the issue have generally followed the reasoning of Fischer II. _______ The Tenth Circuit recently applied the Fisher II test in holding ______ that "serious consideration" of a severance plan did not occur until a meeting was convened that "gathered together the heads of all departments related to employee benefits" to discuss a specific proposal. Hockett, 109 F.3d at 1524. In Hockett, the _______ _______ Sun Company's vice president of human resources was contacted by the plaintiff-employee regarding the possibility of an early  ____________________ 6 We add a gloss to the Fischer II court's formulation by way of _______ clarification. To prevail under the Fischer II test, a plaintiff _______ must show that a specific proposal under serious consideration would have affected him. This we recognize is implicit in _________________________ Fischer II and the rules governing ERISA standing, but to avoid _______ any misunderstanding it is best said explicitly. -14- retirement program. Id. at 1519. The vice president did not ___ respond to the employee's inquiry, despite the fact that he knew that the subject was being discussed by senior management. Id. ___ at 1521. Because of the employer's frequent need to review retirement plans, the Hockett panel determined that the "Fischer _______ _______ II formulation appropriately narrows the range of instances in which an employer must disclose, in response to employees' inquiries, its tentative intentions regarding an ERISA plan." Id. at 1523. ___ Although the Sixth Circuit's opinion in Muse v. I.B.M. ____ ______ did not directly refer to Fischer II, it advocated a similar _______ test, holding that "serious consideration" exists only when "a company focuses on a particular plan for a particular purpose." 103 F.3d at 494. The Muse court was guided by what it found to ____ be Congress's main object in imposing disclosure requirements on ERISA fiduciaries, namely, to "ensure that 'employees [would have] sufficient information and data to enable them to know whether the plan was financially sound and being administered as intended.'" Id. at 494 (alteration in original)(quoting H.R. ___ Rep. No. 533, at 11 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4649). Because an early disclosure requirement would "increase the likelihood of confusion on the part of the beneficiaries [and] . . . management would be unduly burdened by the continued uncertainty of what to disclose and when to disclose it," the court required the existence of a "particular plan for a particular purpose." Id. It also found that "there [was] no ___ -15- convincing evidence that suggest[ed] that IBM studied the possibility of enhanced benefit plans for any reason other than to gain a general appreciation of its options." Id. ___ As we have already indicated, our embrace of the Fischer II approach is influenced by similar appreciation of the _______ conflicting interests that ERISA seeks to reconcile. A primary concern of Congress in enacting ERISA was not to discourage employers from offering employee pensions. "We know that new pension plans will not be adopted and that existing plans will not be expanded and liberalized if the costs are made overly burdensome, particularly for employers who generally foot most of the bill." 120 Cong. Rec. 29,945 (1974)(statement of Senator Long)(reprinted in Jensen, supra note 5, at 155-56). Equally _____ important, the practical constraints of a severance program, and the very purpose for which it is designed, counsel delaying disclosure of a company's plans until a proposal becomes sufficiently firm. "Changing circumstances, such as the need to reduce labor costs, might require an employer to sweeten its severance package, and an employer should not be forever deterred from giving its employees a better deal merely because it did not clearly indicate to a previous employee that a better deal might one day be proposed." Swinney v. General Motors Corp., 46 F.3d _______ ____________________ 512, 520 (6th Cir. 1995). Indeed, it is not implausible that imposing a threshold lower than that of Fischer II would _______ frustrate the very purposes for which a severance program typically is designed: to reduce a workforce by voluntary means. -16- See Pocchia, 81 F.3d at 279 ("Employees simply would not leave if ___ _______ they were informed that improved benefits were planned if workforce reductions were insufficient."). At the same time, the fiduciary concerns underlying ERISA are not to be ignored. "After all, ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection." Varity Corp., 116 S. Ct. at ____________ 1070. ERISA's primary goal is to "protect[] employee pensions and other benefits by . . . setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans." Id. The Fischer II court was ___ _______ therefore careful to emphasize that "this formulation does not turn on any single factor; the determination is inherently fact- specific. Likewise, the factors themselves are not isolated criteria; the three interact and coalesce to form a composite picture of serious consideration." Fischer II, 96 F.3d at 1539 _______ (citation omitted). Thus, "[a] specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal. What is required, consistent with the overall test, is a specific proposal that is sufficiently concrete to support consideration by senior management for the purpose of implementation." Id. at 1540. Correspondingly, while ___ "[c]onsideration by senior management is . . . limited to those -17- executives who possess the authority to implement the proposed change," id., this prong ___ should not limit serious consideration to deliberations by a quorum of the Board of Directors . . . . It is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operation. Id. This emphasis on flexibility permits a trial court to apply ___ the three-pronged standard without slighting the core fiduciary principle that "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." Varity Corp., 116 S. Ct. at 1074 (alteration in _____________ original) (quoting Peoria Union Stock Yards Co. Retirement Plan ______________________________________________ v. Penn Mut. Life Ins. Co., 698 F.2d 320, 326 (7th Cir. 1983)). _______________________ Our primary reason for emphasizing the Fischer II _______ test's flexibility is to remove any temptation that might exist to deliberately evade one of its three factors as a means of subverting ERISA's fiduciary commands. If it is clear from the totality of the facts that a severance package is, in fact, under serious consideration, we do not think that clever manipulation of the Fischer II test should relieve a wrongdoer from ERISA _______ liability. The ultimate question is whether "a composite picture of serious consideration" has developed. Fischer II, 96 F.3d at _______ 1539. We recognize, of course, that this cautionary note is directed to the exceptional case. Thus, in the typical case, where there is no evidence of a deliberate attempt to circumvent -18- ERISA, a straightforward application of the Fischer II test is _______ all that is required. We thus conclude, modifying Fischer II, that serious _______ consideration of a change in plan benefits exists when (1) a specific proposal which would affect a person in the position of the plaintiff (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement that change. B. B. Turning to the facts of this case, it is clear that no early retirement plan affecting Vartanian was under serious consideration by Monsanto's senior management on April 21, 1991, the day when Vartanian began his final inquiries. President Potter had begun conferring with his senior managers about the possibility of a corporate restructuring. He had asked for an estimate of the cost that Monsanto would incur if 400 employees were laid off. But these corporate ruminations, precipitated by the downturn in Monsanto's business, did not trigger any contemporaneous duty of disclosure. First, there was no specific proposal under consideration. At most, there was a suggestion that an enhanced severance package might be one way to deal with the company's fiscal woes. Second, although Potter was certainly among those individuals qualifying as "senior management with the authority to implement the change," there is no evidence that anything of substance was, in fact, being discussed for implementation. The -19- ideas that were floating among top management were only that -- ideas. As a result, the answers that Vartanian received in March and April of 1991, that no material changes affecting his benefit plan were being considered, were not misrepresentations. Potter received an endorsement on May 7, 1991, of his restructuring proposal from the Monsanto Executive Management Committee. Nine days later, he ordered the director of employee benefits to begin planning a severance program for those employees who would be displaced. Not until the May 28, 1991 meeting of senior managers was it proposed to extend the early retirement plan to all Monsanto employees. This is the point at which "the three [factors] interact[ed] and coalesce[d] to form a composite picture of serious consideration," giving rise to a fiduciary duty of disclosure. Fischer II, 96 F.3d at 1539.7 _______ Conclusion Conclusion Vartanian's additional arguments on appeal are of no merit.8 While we recognize that the outcome of this protracted  ____________________ 7 It appears that Monsanto went further than we might require. After serious consideration had occurred, two employees who had announced their intention to retire without inquiring about possible changes in their retirement plans were retroactively paid the value of the benefits enhancement. 8 Vartanian asserts error in the district court's grant of summary judgment to Monsanto on his claim under 510 of ERISA, which makes it unlawful for any person to discriminate against a plan participant for purposes of interfering with any right under a benefit plan. Vartanian's assertion, however, depends upon a finding of a material misrepresentation. He also suggests that, because a determination of "serious consideration" is fact-specific, it can only be resolved by a jury. At the summary judgment stage, however, only disputes of material fact need be resolved by a fact-finder. Fed. R. Civ. P. -20- litigation is an unhappy one for Vartanian, benefit plan rules and practices "inevitably hurt 'some individuals who find themselves on the wrong side of the line.'" Palino, 664 F.2d at ______ 859 (quoting Rueda v. Seafarers Int'l Union, 576 F.2d 939, 942 _____ ______________________ (1st Cir. 1978)). While it may be small comfort, Vartanian's perseverance has resulted in the clarification of an important area of ERISA law in this circuit. For the foregoing reasons, the judgment of the district court is affirmed. Costs to appellees. affirmed ________  ____________________ 56(c). Finally, Vartanian asserts error in the district court's grant of a motion to strike his jury demand. Because we affirm the district court's grant of summary judgment, we need not reach the issue of Vartanian's failure to file a timely notice of appeal. See Smith v. Barry, 502 U.S. 244, 248 (1992)(noncompliance is ___ _____ _____ jurisdictional and fatal). -21-