USCA1 Opinion

 

 United States Court of Appeals For the First CircuitNo. 98-1654 STANLEY A. RODOWICZ, ET AL., Plaintiffs, Appellants, v. MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, ET AL., Defendants, Appellees.No. 98-1690 STANLEY A. RODOWICZ, ET AL., Plaintiffs, Appellees, v. MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, ET AL., Defendants, Appellants. APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Michael Ponsor, U.S. District Judge] Before Boudin, Circuit Judge,   Aldrich and Campbell, Senior Circuit Judges.    John C. Sikorski with whom Keith A. Minoff and Robinson,Donovan, Madden & Barry, P.C. were on brief for plaintiffs. David G. Cohen with whom Charles S. Cohen and Egan, Flanaganand Cohen, P.C. were on brief for defendants.September 15, 1999    CAMPBELL, Senior Circuit Judge. Plaintiffs each retiredfrom defendant Massachusetts Mutual Life Insurance Company("MassMutual" or "the Company") under terms that were lessfavorable than those in a special offer made to employees soonafter. They filed suit against MassMutual and the MassachusettsMutual Voluntary Termination Program ("VTP"), alleging that byfailing to reveal that a more favorable retirement option wasforthcoming, MassMutual violated its fiduciary duties under theEmployee Retirement Income Security Act of 1974 ("ERISA") (codifiedat 29 U.S.C. §§ 1001 et seq.). Plaintiffs also alleged misrepresentation under Massachusetts common law. The districtcourt dismissed plaintiffs' ERISA claims on the ground that theseverance package offered by the Company did not constitute a"plan" for purposes of ERISA. Exercising supplementaljurisdiction, the court also granted summary judgment dismissingthe state law misrepresentation claims as well as later-addedestoppel claims. Plaintiffs appeal from the grant of summaryjudgment on their state law claims. MassMutual cross-appeals fromthe district court's ruling that the severance package is not a"plan" governed by ERISA. The Company contends that should thecase be remanded to the district court, only plaintiffs' ERISAclaims will survive.  For the reasons that follow, we affirm the districtcourt's dismissal of plaintiffs' ERISA claims. We also affirm,although on grounds somewhat different from those stated by thedistrict court, the dismissal of most of plaintiffs' state lawclaims, but reverse and remand for trial the claims of three of theeight plaintiffs. I. FACTS  This case has followed a torturous path. The underlyingfacts and procedural history are set forth in two opinions below. See Rodowicz v. Massachusetts Mutual Life Ins. Co., 857 F. Supp.992 (D. Mass. 1994); Rodowicz v. Massachusetts Mutual Life Ins.Co., 3 F. Supp.2d 1481 (D. Mass. 1998). We summarize the factspertinent to the issues raised in the parties' appeals.  In 1990, MassMutual began to be concerned that seniorexecutives were not leaving the company in sufficient numbers tomake room for the promotion of other executives. To address thisproblem, employees drafted a 1990 Voluntary Incentive Program("VIP"), which was intended to induce more senior executives toretire. The VIP was never adopted. However, the VIP documentswere saved by the Company for possible use at a later date.  During the summer of 1991, for the first time inMassMutual's history, two ratings agencies lowered their ratings ofMassMutual products. The agencies were especially concerned thatMassMutual was over-invested in real estate, creating the danger that losses in that sector could impact negatively upon theCompany's value. The agencies' downrating occurred at a time whenboth the national economy and the insurance industry wereexperiencing economic troubles.  MassMutual thereupon began to consider what measures itcould take to lower costs. As employee salaries comprised thelargest single category of cost, at the end of 1991 seniorexecutives at MassMutual looked into reducing staffing levels. After consideration, however, the Company decided against workforcereduction at the time. In February 1992, Thomas Wheeler, MassMutual's ChiefExecutive Officer, delivered an annual "state of the company"speech to all employees. The February 14, 1992 issue of thecompany newsletter, the MassMutual News, summarized Wheeler'sremarks. Wheeler stated, in essence, that MassMutual was in goodfinancial condition. He stated that while the ratings downgradehad "hurt our pride," there "would be no change in how we dobusiness." Wheeler went on to state: "We are a company withintegrity. We handle our business ethically and are better thanour competitors." During the speech, Wheeler made no reference toany reduction in the Company's workforce.  In March 1992, John Pajak, MassMutual's Chief OperatingOfficer, assigned to senior members of his management team the taskof determining the costs and savings from a workforce reduction. In connection with this assignment, Susan Alfano, Senior VicePresident in Charge of Human Resources, gathered data from theCompany's outside employee benefits consultant. Between March andSeptember, 1992, Alfano thoroughly analyzed the costs and benefitsof a reduction in force.  On September 17, 1992, Wheeler, Pajak, and other seniorMassMutual executives met for the purpose of reviewing theCompany's five-year budget. During the meeting, Wheeler and Pajakdiscussed MassMutual's wages and salaries paid, which, as said,were the Company's largest operating expense. Wheeler asked Pajakto develop some options for reducing this expense. Specifically,Wheeler instructed Pajak to "dust off" the VIP that had beendeveloped in 1991. On September 30, 1992, Pajak and Alfano made apresentation to the President's Cabinet, a formal MassMutualgoverning body that consisted of senior executives who reporteddirectly to Wheeler. Pajak and Alfano recommended that the Companyconsider the possibility of a two-step reduction in force, in whicha voluntary termination program ("VTP") would be followed by involuntary layoffs, to be completed by early 1993. Immediatelyfollowing this presentation, Pajak and Alfano were instructed todevelop the details of such a program for further consideration.  In early October, 1992, senior MassMutual employees begandeveloping the specifics of a workforce reduction program. ByOctober 12, 1992, the terms of the VTP were drafted, and theCompensation Committee of MassMutual's Board of Directors for thefirst time authorized Wheeler to adopt the plan at his discretion. On October 19, 1992, Wheeler decided to adopt the VTP. The Companyannounced the adoption of the plan on October 23, 1992. The termsof the VTP were not finally settled and the plan documents were notsigned until mid-November, 1992. The VTP was open to most full-time MassMutual employees,about 4,000 in number. The plan provided for a one-time, lump sumseverance bonus equal to: (1) three weeks of salary for every yearof service, up to a maximum of 78 weeks, or (2) one week of salaryfor each full $5,000 of compensation, and a proportionate amountfor an increment less than $5,000, up to a maximum of 52 weeks. The Company set December 1, 1992 as the deadline for eligibleemployees to elect to participate in the VTP. At its discretion,however, the Company could defer an employee's election date beyondthe December 1 deadline, but in no case past June 30, 1993. TheVTP included a mechanism whereby employees to whom the Companydenied benefits could appeal from the denial.  Only employees who retired on or after October 23, 1992and before January 2, 1993 were eligible to receive benefits underthe VTP. Each of the named plaintiffs retired from MassMutualbetween August 1, 1992 and October 1, 1992. All of the plaintiffswould have received substantially higher retirement benefits ifthey had waited to retire until after October 23, 1992. Plaintiffs each claim to have decided to retire afterbeing lulled by misrepresentations made by Company personnel to theeffect that no change in retirement benefits was planned. Thespecific allegations are set forth below.  Plaintiff Stanley Rodowicz claims that in late August orearly September 1992, Laura Cowles, an employee in Corporate HumanResources, told him that the Board of Directors had decided thatthere would be no change in the retirement package. PlaintiffBarbara Binsky alleges that in or around May 1992, she asked ByronMattson, a Second Vice President, whether there was going to be anygolden parachute or early retirement incentive. He answered"absolutely not, there will be no golden handshake." Later, Binskyasked a similar question of Priscilla Dill, a retirement counselor,who replied: "I really don't think there will be anything." Plaintiff Anne Buck alleges that in July 1992, she wastold by Dill that "I am not aware of anything coming down theroad," or, as far as Dill knew at that point in time there wasnothing going on with retirement packages. Sometime before May1992, Michael Walker, Buck's former boss, allegedly told her that "anything can happen, but we have no definite plans [to adopt anyenhanced benefits]." Plaintiff Patricia Kennedy claims that in the spring of1992, she was present when her boss, Linda Egan, told people at adepartment meeting that there would not be any severance program orearly retirement incentive program. Plaintiff James Lemon claimsthat in the summer of 1992, he attended a retirement meeting atwhich Jack Wilson, a supervisor in Human Resources, announced thatthere would be no enhanced benefit package. Also, in 1985, KennethCardwell, a MassMutual employee without any responsibility foremployee benefits, had told Lemon that a severance payment offeredto employees in other divisions would not be offered to hisdivision.  Plaintiff Margaret Stevens alleges that in April 1992,she was told by Pat Ogoley, a retirement counselor, that she [Ms.Ogoley] did not know whether there would be any early retirementincentives. At some other time, another retirement counselor,Lois DeGray, indicated in response to an inquiry from Stevens thatthere would not be any enhanced benefit package or "goldenhandshake." Plaintiff Sigmund Ziemba claims that in the spring of1992, he happened to see Robert Pouliot, a senior officer at thecompany, in a hallway. Pouliot asked Ziemba how he was, and Ziembaresponded that he was considering retirement but was concerned, ashe understood that there might be a "package." Pouliot respondedthat he did not know, but that that was not what he had heard. Plaintiff Raymond Faniel assumed that, as a forty-fiveyear employee, MassMutual would keep him abreast of any pendingchanges in employee benefits. In March 1992, Faniel spoke with Priscilla Dill who, in response to Faniel's statement that it"doesn't look like there [will] be any changes," stated "I don'tknow, I don't think so, I haven't heard anything."  In addition to these specific statements, each of theplaintiffs asserted that they were misled by Wheeler's statements,quoted in the February 12, 1992 MassMutual News, to the effect thatthe Company was in good financial condition and there would be "nochange" in the Company's course.  II. PROCEDURAL HISTORY Plaintiffs brought suit in federal court, invoking ERISAand the district court's federal question jurisdiction. Theplaintiffs' original complaint contained two counts under ERISA forbreach of fiduciary duty and improper administration of an employeebenefit plan, as well as one count under Massachusetts common lawalleging negligent and/or intentional misrepresentation. In anopinion issued on July 27, 1994, the district court denied, inpart, defendants' motion to dismiss with regard to the two ERISAcounts but allowed the motion with regard to the misrepresentationclaims on the ground that plaintiffs' common law misrepresentationclaims were preempted by ERISA. See Rodowicz, 857 F. Supp. at 999.  In 1995 this court, in Belanger v. Wyman-Gordon Co., 71F.3d 451, clarified the circumstances under which benefits given toemployees would constitute a "plan" for purposes of ERISA. Thedistrict court ordered the parties to submit memoranda regardingthe applicability of Belanger, and, thereafter, concluded that theMassMutual VTP did not, in fact, constitute an employee benefit"plan" within the meaning of ERISA. See Rodowicz v. MassachusettsMutual Life Ins. Co., 915 F. Supp. 486, 489-90 (D. Mass. 1996). Hence the district court, sua sponte, dismissed plaintiffs' ERISA-based claims. The district court was then faced with a rather unusualsituation. The effect of the court's ruling that the VTP was nota "plan" subject to ERISA was to leave plaintiffs with no viableclaims to pursue, as the court had previously dismissed all ofplaintiffs' state law claims on the basis of ERISA preemption. Asit seemed unfair to deprive plaintiffs of an opportunity to pursuetheir common law claims "merely as an outcome of the rapidly-evolving nature of ERISA law," the district court reconsidered andvacated its July 27, 1994 ruling and reinstated plaintiffs' commonlaw misrepresentation claims. Id. at 491. The district court alsoallowed plaintiffs to amend their complaint to assert additionalcommon law claims for violation of the covenant of good faith andfair dealing, and both promissory and equitable estoppel. Thecourt retained jurisdiction over the common law claims "as a matterof discretion." Id. In an opinion issued on April 24, 1998, the districtcourt granted defendants' motion for summary judgment as to all ofplaintiffs' common law claims. See Rodowicz, 3 F. Supp. 2d at1489. The court based its decision primarily upon Vartanian v.Monsanto Company, 131 F.3d 264 (1st Cir. 1997), in which we heldthat an employer has a fiduciary duty under ERISA to disclosechanges in retirement benefits at the point when "seriousconsideration" of the change in benefits occurs. See id. at 268. The district court concluded that summary judgment was warranted asto all of plaintiffs' claims because plaintiffs could notdemonstrate that the VTP was under "serious consideration" byMassMutual until at least September 1992, by which time six of theeight plaintiffs had already retired, and after which neither ofthe two remaining plaintiffs made any inquiry regarding possiblechanges in retirement benefits.  III. DISCUSSION  On appeal, plaintiffs assert that the district courterred in granting summary judgment in favor of defendants on thestate common law claims. In its cross-appeal, MassMutual assertsthat the district court erred in concluding that the VTP was not a"plan" governed by ERISA. The Company argues that in the event wedetermine that reversal of the district court's grant of summaryjudgment is warranted in any respect, plaintiffs should bepermitted to proceed, if at all, only with regard to their ERISA-based claims. We will first address the issue raised byMassMutual's cross-appeal. A. Dismissal of the ERISA Claims The district court dismissed plaintiffs' ERISA-basedclaims on the ground that the MassMutual VTP was not an "employeebenefit plan" governed by ERISA. Our standard of review to such aruling is deferential. "[A]s long as the trial court accuratelyapplies the relevant legal standards, the existence vel non of anERISA plan is principally a question of fact, and the court ofappeals must defer to the district court's judgment unless thatjudgment is clearly erroneous." Belanger v. Wyman-Gordon Co., 71F.3d 451, 453 (1st Cir. 1995). "The beacon by which we must steer" to determine whetherthe MassMutual VTP is a covered ERISA "plan" is the Supreme Court'sopinion in Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987). Id., 71 F.3d at 454. In Fort Halifax, the Court stated that anemployee benefit package is such a "plan" only if its "provision bynature requires an ongoing administrative program to meet theemployer's obligation." Id. at 11. See also District of Columbiav. Greater Wash. Bd. of Trade, 506 U.S. 125, 130 n.2 (1992) (planrequires "some minimal, ongoing 'administrative' scheme orpractice"). In Fort Halifax, the Court found that a Maine statuterequiring employers to tender a one-time severance payment todisplaced employees was not a "plan" because it called for no morethan a "one-time, lump-sum payment triggered by a single event." Id. at 12. ERISA did not apply because the Maine statute createdno "need for an ongoing administrative program for processingclaims and paying benefits." Id.  In Fort Halifax, the Supreme Court emphasized that Congress had enacted ERISA in order to (1) protect employees froma "patchwork scheme" of employee benefit regulations, and (2)safeguard the financial integrity of employee benefit funds overthe long term. See id. at 12, 15-16. Neither concern isimplicated by a one-time payment triggered by a single event. Bycontrast, ongoing investments and obligations may give rise to a"patchwork scheme" of benefit regulations that are vulnerable toemployer abuse, and thus implicate the purposes of ERISA. See id.at 16.  Following Fort Halifax, this court has stated that "theexistence of a plan turns on the nature and extent of an employer'sbenefit obligations." Belanger, 71 F.3d at 454. See also Wickmanv. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1083 (1st Cir.) (the"crucial factor in determining if a 'plan' has been established iswhether the [proffering of an employee benefit] constituted anexpressed intention by the employer to provide benefits on aregular and long term basis"), cert. denied, 498 U.S. 1013 (1990). "[S]o long as a proffered benefit does not involve employerobligations materially beyond those reflected in Fort Halifax . .. the benefit will not amount to a plan under the ERISA statute." Belanger, 71 F.3d at 455.  In Belanger, we held that a series of early retirementoffers by which the defendant employer committed to give eacheligible employee a one-time, lump-sum severance bonus equal to aweek's salary for each year of employment with the company did notconstitute a "plan" for purposes of ERISA. We stated that theseoffers were "precisely the kind of one-time, lump-sum payment thatthe Fort Halifax Court clearly excluded from the pantheon of ERISAplans." Id. at 455. By contrast, in Simas v. Quaker Fabric Corp.,6 F.3d 849 (1st Cir. 1993), we had held that the Massachusetts "tinparachute" statute, which authorized severance pay for employeeswho lost their jobs within twenty-four months following a corporatetakeover, required an ongoing administrative scheme and wastherefore a "plan" for purposes of ERISA. The "tin parachute"statute was triggered separately for each employee by theemployee's individual termination within one of several alternativetime periods. The statute also required the plan administrator todetermine whether each employee was eligible for unemploymentcompensation under Massachusetts law. We described this as"effectively a cross-reference to other requirements," mostimportantly that the employee not have been discharged "for cause"within the meaning of state law. See id. at 853. We thought that individualized determinations, which would have taken place overthe course of at least two years after the takeover, required"ongoing administrative obligations . . . of a kind and over a timeperiod, that go far enough beyond Fort Halifax to call the regimea 'plan' within the meaning of ERISA." Id.  Applying these precedents, the district court concludedthat the MassMutual VTP "bears a striking resemblance to theindividual severance packages in Belanger." Rodowicz, 915 F. Supp.at 489. The district court reasoned that the one-time bonusoffered for the two-month period in the VTP, like the offers madein Belanger, was available to virtually all full-time MassMutualemployees, required little in the way of administrative burden orexpense, and did not require that the Company make a long-termfinancial commitment to any employee who chose to participate inthe VTP. See id. The district court recognized that the VTPexpressly excluded employees who had been "involuntarilyterminated," calling for a determination that might be likened tothe "for cause" decision in Simas. But based upon itsinterpretation of the VTP documents, the district court thoughtthat the type of individualized determination required in Simaswould not be required under the VTP, as the administrator of theVTP was authorized in his discretion to exclude all employees whohad been terminated "for any reason or no reason at all." See id.at 490. No careful assessment of "cause" would be required.Further, unlike the plan in Simas, the district court reasoned thatthe VTP did not require the administrator to make exclusiondeterminations over an extended period of time. See id. Finally,the district court concluded that the Company's decision to deferthe election dates of some employees up to June 30, 1993 imposed noongoing administrative burdens or financial obligations on theCompany, but rather merely deferred the writing of a check untilthat time. See id.  We are unable to say that the district court's evaluation that, on its particular facts, the MassMutual VTP did notconstitute an ERISA "plan" was "clearly erroneous." See Belanger,71 F.3d at 453. True, the VTP authorized certain exclusions anddeferrals, as well as appeals by disappointed employees, making itsomewhat less mechanical and unthinking than the Maine statutoryscheme in Fort Halifax and the one-time payment schemes inBelanger. Yet, as the district court found, the VTP did not callfor the sort of ongoing, individualized determinations necessitatedby the "tin parachute" statute addressed in Simas. The questionunder Fort Halifax, as we acknowledged in Simas, is a matter ofdegree. See Simas, 6 F.3d at 853. "[S]o long as Fort Halifaxprescribes a definition based on the extent and complexity ofadministrative obligations, line drawing of this kind is necessaryand close cases will approach the line from both sides." Simas, 6F.3d at 854. The district court's conclusion that the VTP did notgo significantly beyond the employer obligations in Fort Halifaxwas a supportable one. See id. at 12 (no plan for purposes ofERISA in absence of "periodic demands on [employer] assets thatcreate need for financial coordination and control"). The courtidentified the correct legal standard and supportably found thatthe VTP fell closer to the factual situation in Belanger than inSimas. We, therefore, hold that plaintiffs' ERISA-based claimswere properly dismissed by the district court on summary judgment.B. The State Law Claims After the district court dismissed plaintiffs' ERISA-based claims, it retained jurisdiction over plaintiffs' statecommon law claims and dismissed all of them on summary judgment. We review de novo the district court's grant of summary judgment. See Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104,108-09 (1st Cir. 1997). Summary judgment is appropriate where "thepleadings, depositions, answers to interrogatories, and admissionson file, together with the affidavits, if any, show that there isno genuine issue as to any material fact and that the moving partyis entitled to judgment as a matter of law." Fed. R. Civ. P.56(c). While we draw all inferences in the light most favorable tothe non-moving party, here the plaintiffs, "[t]he mere existence ofa scintilla of evidence in support of the plaintiff's position willbe insufficient; there must be evidence on which the jury couldreasonably find for the plaintiff." Anderson v. Liberty Lobby,Inc., 477 U.S. 242, 252 (1986).  The district court advanced alternative reasons forentering summary judgment in favor of MassMutual with regard toplaintiffs' common law claims. Under Massachusetts law, aplaintiff in a misrepresentation action must prove a falsestatement of material fact made to induce the plaintiff to act,together with reasonable reliance on the false statement to theplaintiff's detriment. See Zimmerman v. Kent, 31 Mass. App. Ct.72, 77 (1991). The district court concluded without explanationthat "[t]he undisputed facts confirm that no employee of thedefendant, knowingly or unknowingly, conveyed a false statement ofany kind, let alone one of material fact, to the plaintiffs toinduce them to act." Rodowicz, 3 F. Supp.2d at 1487. The courtalso stated, again without elaboration, that it was "a stretch" tocharacterize any of the statements made to plaintiffs asrepresentations of fact at all. See id. at 1488.  The district court did not ultimately rest its grant ofsummary judgment on principles of Massachusetts tort law, however. "More importantly," the district court continued, "absolutely noevidence supports plaintiff's position that a specific proposedbenefits package was in fact under 'serious consideration' beforethe middle or end of September 1992 at the absolute earliest." Id.at 1488. The district court borrowed its "serious consideration"criterion from Vartanian v. Monsanto Co., 131 F.3d 264 (1st Cir.1997). There we held that an employer breaches its fiduciary dutyunder ERISA when it misrepresents to its employees that no changein benefits is forthcoming when, in fact, the employer has such achange under "serious consideration." See id. at 272. We heldthat "serious consideration" of a change in plan benefits existswhen: "(1) a specific proposal which would affect a person in theposition of plaintiff (2) is being discussed for purposes ofimplementation (3) by senior management with the authority toimplement that change." Id. The district court concluded thatthese three factors did not coalesce here until, at the earliest,September 30, 1992, when Pajak and Alfano made their presentationto the President's Cabinet. As all but two of the plaintiffs hadretired prior to that time, and as the two remaining employees madeno inquiries regarding an enhanced retirement package afterSeptember 17, 1992, the district court concluded that none of theplaintiffs had a viable misrepresentation claim.  Plaintiffs assail the district court's conclusion that"although technically advanced under theories of [Massachusetts]common law," their state law claims are "controlled by the body ofdecisions governing lawsuits under [ERISA]." Rodowicz, 3 F. Supp.2d at 1486. They argue on appeal, as they did below, that thedistrict court should have applied Massachusetts common law to eachof their claims. Plaintiffs assert that an application ofMassachusetts common law principles would lead to the conclusionthat there are triable issues of fact that preclude summaryjudgment as to each of their claims. We agree with plaintiffs thatMassachusetts common law provides the relevant yardstick. Usingthat yardstick, we believe it was error to grant summary judgmentagainst three of the plaintiffs, although we affirm as to theothers.  The "serious consideration" test is not a product of thecommon law, but rather was developed by federal courts inlitigation involving ERISA claims for breach of fiduciary duty. InVartanian, this circuit adopted a mode of analysis utilized by theThird Circuit in Fischer v. Philadelphia Elec. Co., 96 F.3d 1533(3d Cir. 1996), cert. denied, 117 S. Ct. 1247 (1997)("Fischer II"). We said we adopted the Fischer II approach because of the"conflicting interests that ERISA seeks to reconcile." Vartanian,131 F.3d at 271. We pointed out that Congress had sought in ERISAto protect employee pensions and other benefits while notdiscouraging employers from offering such benefits in the firstplace. See id. ("Indeed, it is not implausible that imposing athreshold lower than that of Fischer II would frustrate the verypurposes for which a severance program typically is designed: toreduce a workforce by voluntary means"). We saw the "seriousconsideration" test as "delineat[ing] the point at which one formof reasonable employer behavior, namely the confidentialconsideration of an employee severance proposal, is overbalanced bythe corresponding fiduciary duty imposed by ERISA." Vartanian, 131F.3d at 268. Under the test, only those changes in benefits thathave reached a level of "serious consideration" and are thus"material" to an employee's decision whether to retire must bedisclosed to employees. See Fischer II, 96 F.3d at 1538 (equating"materiality" for purposes of ERISA fiduciary duty analysis with"serious consideration"). An employer retains its prerogative toconsider options confidentially in the normal course of business,and has a duty to disclose its plans, where necessary to prevent anaffirmative representation from being misleading, only at a pointwhen a specific benefit plan exists, its implementation is beingdiscussed, and senior management are involved.  Even though it had earlier determined that the MassMutualVTP did not qualify as an ERISA "plan," the district court appliedthe Vartanian "serious consideration" test because it concludedthat Massachusetts and federal law do not differ with regard to thestandard for "materiality." Rodowicz, 3 F. Supp.2d at 1487. Weagree that the basic standard of "materiality" is the same underfederal and state law  "whether 'a reasonable man would attachimportance [to the facts not disclosed] in determining his choiceof action in the transaction in question,'" Zimmerman, 31 Mass.App. Ct. at 78 (quoting Rogen v. Ilikon Corp., 361 F.2d 260, 266(1st Cir. 1966)) (bracketed material in original). But "seriousconsideration" is a special gloss on the common law materialitystandard that has been developed by federal courts in ERISA breachof fiduciary duty cases expressly to serve the interests implicatedby ERISA. Because of those weighty interests, the "seriousconsideration" test differs from the common law materialitystandard in various ways.  For example, the "serious consideration" test may requiremore of a plaintiff in terms of proof than does the common lawmateriality standard. Under Massachusetts law, a misstatementconcerning retirement benefits is "material" if it is more likelythan not that it would lead a reasonable employee to retire. Butby requiring a plaintiff to prove the existence of all threeelements under the "serious consideration" standard, courts requirethat there be a "substantial likelihood" that the employee wouldnot have retired had the statement not been made. Compare Fischerv. Philadelphia Electric Co., 994 F.2d 130, 135 (3d Cir.) (defining"materiality," for purposes of "serious consideration test, as"substantial likelihood" that the misrepresentation would misleada reasonable employee), cert. denied, 510 U.S. 1020 (1993)("Fischer I") with Zimmerman, 31 Mass. App. Ct. at 78("materiality" under Massachusetts law defined as whetherreasonable man "would attach importance [to the fact notdisclosed]").  Further, to satisfy the "serious consideration" test, aplaintiff must demonstrate that a misrepresentation concerns aspecific change in benefits that is actively under consideration bypersons in senior management with the authority to implement thechange. Then and only then can an employee be said to havereasonably relied upon a misstatement concerning changes inbenefits such that his or her claim may reach the jury. See, e.g.,Hockett v. Sun Company, Inc., 109 F.3d 1515, 1524 (10th Cir. 1997)(holding that misrepresentations concerning a severance plan didnot become material under "serious consideration" test until ameeting was convened that "gathered together the heads of alldepartments related to employee benefits" to discuss a specificproposal). By contrast, a trial court applying common lawprinciples may withdraw a misrepresentation case from the jury onlyupon concluding that the fact misrepresented "is so obviouslyunimportant that the jury could not reasonably find that areasonable man would have been influenced by it."). Restatement(Second) of Torts § 538(2)(a), comment e (emphasis supplied).  In our view, a reasonable employee could "attachimportance" to and be influenced by misstatements that fail to meetthe strict requirements of the "serious consideration" test. Astatement, for example, that no change in benefits is beingcontemplated made at a time when several proposals urging suchchanges are on the table but, as yet, senior management with theauthority to implement a change has not yet chosen a specific planfor implementation cannot be said to be "so obviously unimportantthat the jury could not reasonably find that a reasonable man wouldhave been influenced by it." In such a case, the existence of theproposals and the attendant discussion might reasonably be expectedto influence a decision with respect to retirement.  We hold that it was error for the district court to applythe "serious consideration" test to plaintiffs' state law claims. The Massachusetts Supreme Judicial Court may someday be persuadedto apply the "serious consideration" test in situations analogousto this, but it has not yet done so. Until such time, the standard for "materiality" is as set forth in Massachusetts caselaw and the Restatement (Second) of Torts. Cf. Adams v. Coveney,162 F.3d 23, 26 (1st Cir. 1998) (concluding that Massachusettscourts would not necessarily adopt federal "responsible person"standard in determining whether individual had duty to paywithholding and meals taxes, and applying instead state common lawstandard). Applying that standard, we cannot say that all of theplaintiffs' claims fail on summary judgment. Under Massachusetts law, plaintiffs had to demonstratethat MassMutual (1) made false statements of material fact (2) toinduce them to retire when they did, and (3) that they reasonablyrelied on those statements to their detriment. Zimmerman, 31 Mass.App. Ct. at 77. If plaintiffs failed to demonstrate any one ofthese elements, their misrepresentation claims must be dismissed.  The statements allegedly relied upon by plaintiffs mustbe ones of fact, not of "expectation, estimate, opinion, orjudgment." Id. See also Powell v. Rasmussen, 355 Mass. 117, 118(1986). "A representation is one of opinion if it expresses only. . . the belief of the maker, without certainty, as to theexistence of the fact." Restatement (Second) of Torts § 538A(1977) (emphasis supplied). See McEneaney v. Chestnut Hill RealtyCorp., 38 Mass. App. Ct. 573, 574 (1995). We agree with thedistrict court that it is too much of "a stretch" to characterizemany of the statements upon which plaintiffs rely as ones of fact. Rodowicz, 3 F. Supp.2d at 1481.  The statements allegedly made to plaintiffs Binsky, Buck,Stevens, Ziemba, and Faniel "fall[] within the ordinary rule thatfalse statements of opinion, of conditions to exist in the future,or of matters promissory in nature" are not actionable in a claimfor misrepresentation. Yerid v. Mason, 341 Mass. 527, 530 (1960). The statements made to these plaintiffs were cautionary in natureand represented nothing more than the opinion or belief of thedeclarant as to the prospect of future changes in retirementbenefits. See id. at 530-31 (home seller's statements to theeffect that buyers "would have no further trouble with water" incellar were expressions of strong belief, not statements of fact). Some of the statements relied upon were no more than ordinaryworkplace gossip, which is plainly not actionable. Thus, to theextent that they are premised upon these statements, themisrepresentation claims of plaintiffs Binsky, Buck, Stevens,Ziemba, and Faniel were properly dismissed as they did not meet the"statement of fact" requirement under Massachusetts law. We reach a similar conclusion insofar as plaintiffs'misrepresentation claims are each based upon the statements made byPresident Wheeler during the "state of the company" speech, as reported in the MassMutual News. As the district court stated: Bromides in a company newsletter about MassMutual's good financial shape and the President's intention not to make any fundamental changes, cannot be construed as affirmative representations with regard to retirement benefits. To hold otherwise would transform any effort to comment generally on a company's performance into a minefield of potential liability. Rodowicz, 3 F. Supp.2d at 1488. We agree that the statementsreported in the Company newsletter did not constituterepresentations, much less material misrepresentations, concerningthe Company's plan with regard to retirement benefits. Thus, tothe extent that plaintiffs' claims are based upon statements in thecompany newsletter, they were properly dismissed.  Certain of plaintiffs' misrepresentation claims fail foran additional reason. Plaintiffs sued MassMutual based uponalleged material misrepresentations made by certain individualemployees concerning retirement benefits. In Massachusetts, anemployer may be held liable for the tortious acts of an employee if the acts were committed within the scope of the employment. SeeWorcester Ins. Co. v. Fells Acre Day School, Inc., 408 Mass. 393,404 (1990). Conduct of an employee is within the scope ofemployment if it is of the kind he is employed to perform. WangLaboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854,859 (1986). In order for plaintiffs to hold MassMutual liable forthe alleged misrepresentations made by its employees, plaintiffsmust demonstrate that the declarant had actual or, at least,apparent authority to speak on behalf of the company with respectto retirement benefits. See, e.g., Hudson v. Mass. Property Ins.Underwriting Ass'n, 386 Mass. 450, 457 (1982); see also Restatement(Second) of Agency § 8 (1957).  The record demonstrates that MassMutual retirementcounselors and Human Resources personnel were cloaked with actualor, at least, apparent authority to speak on behalf of the Companywith regard to retirement benefits. Cf. Fischer I, 994 F.2d at 134(benefits counselors possessed apparent authority to provideinformation and guidance with regard to changes in employeebenefits). However, Byron Mattson, Michael Walker, Linda Egan,Kenneth Cardwell, and Robert Pouliot, upon whose statements certainplaintiffs claim to have relied, were neither retirement counselorsnor Human Resources personnel, and therefore did not possess actualauthority to speak on behalf of the Company with regard to employeebenefits. Further, there is no evidence in the record that anyof these employees had apparent authority to answer questions onbehalf of the Company concerning changes in retirement benefits. To the contrary, as plaintiff Faniel, for example, stated in hisdeposition, employees were aware that retirement counselors werethe Company representatives "that you were to go to if you had anyquestions about retirement benefits." With regard to employeesMatson, Walker, Egan, Cardwell, and Pouliot, no evidence evensuggests "conduct by the principal [that] . . . causes a thirdperson reasonably to believe that a particular person . . . has[such] authority." Neilson v. Malcolm Kenneth Co., 303 Mass. 437,441 (1939). Accordingly, the statements made by these employeesto, respectively, plaintiffs Binsky, Buck, Kennedy, Lemon, andZiemba were not made on behalf of the Company and, for that reason,were not actionable. We also conclude, although again on somewhat different grounds than those relied upon by the district court, that summaryjudgment was properly granted with regard to the equitable estoppelclaims brought by plaintiffs Binsky, Buck, Kennedy, Ziemba, andFaniel. Under an equitable estoppel theory, plaintiffs mustdemonstrate that they relied upon a misrepresentation of past orpresent material facts. See Boylston Development Group, Inc. v. 22Boylston Street Corp., 412 Mass. 531 (1992). See also Restatement(Second) of Torts § 872 (tort liability based upon equitableestoppel requires "definite misrepresentation of fact"). Asstated, many of the alleged representations upon which plaintiffsclaim to have relied were mere statements of opinion or belief, notdefinite representations concerning past or present facts. Stillothers were made by employees without the requisite authority tobind the Company in the area of employee benefits. Hence thedistrict court properly granted summary judgment as to most ofplaintiffs' equitable estoppel claims. The preceding discussion disposes of the claims ofplaintiffs Binsky, Buck, Kennedy, Ziemba, and Faniel. However, weconclude that three of the eight named plaintiffs  Rodowicz,Lemon, and Stevens  have viable misrepresentation and estoppelclaims under Massachusetts law. Plaintiff Rodowicz alleges that inlate August or early September, 1992, Laura Cowles, an employee inMassMutual's Corporate Human Resources department, told him thatthe Board of Directors had decided there would be no changes in theretirement package. A jury could reasonably find that Cowlespossessed the requisite authority to speak for the Company withregard to retirement benefits. Further, under Massachusetts law,Cowles's statement, if made, that the Board of Directors haddecided there would be no retirement package changes could be foundto be an assertion of fact as to the Board's action. It is not astatement of mere opinion or belief. Finally, again applyingMassachusetts law, a jury could reasonably find that Cowles'sstatement in September 1992 that the Board had decided there wouldbe no changes in retirement benefits was material and that Rodowiczreasonably relied upon it. Thus, plaintiff Rodowicz is entitled topresent his misrepresentation and equitable estoppel claims to ajury, although, as said supra, he cannot rely upon the statementsmade by President Wheeler in the "state of the company" speech.  We reach the same conclusion with regard to plaintiffsLemon and Stevens. In the summer of 1992, Lemon was allegedly toldby Jack Wilson, a Human Resources employee with responsibility foremployee benefits, that there would be no enhanced benefit package. Plaintiff Stevens was told by Lois DeGray, a retirement counselor,that there would not be any enhanced benefit package or "goldenhandshake." These are statements of fact as to which a reasonablejury could find that Wilson and DeGray were authorized to bind theCompany. A reasonable jury could also find that the statementswere material under the Massachusetts common law standard and thatplaintiffs Lemon and Stevens reasonably relied upon therepresentations. Thus, like plaintiff Rodowicz, plaintiffs Lemonand Stevens are also entitled to present their state common lawclaims to a jury. In saying as we have at several places that the claims ofthese three plaintiffs could be the basis for recovery in a jurytrial, we do not in any way mean to suggest that the plaintiffswill or should necessarily prevail. Issues of fact and assessmentremain to be resolved and, in addition, the evidence at trial mayvary from what we have assumed. But we are required on summaryjudgment to view the issue from the standpoint of the partyresisting summary judgment and while the case may be a close oneeven from that vantage, we think that the three plaintiffs inquestion have crossed the threshold and that their state claimscannot be resolved against them at this stage. IV. CONCLUSION To summarize, we affirm in part and reverse in part thedistrict court's grant of summary judgment in favor of MassMutual. We affirm the district court's dismissal of plaintiffs' ERISAclaims. We affirm the district court's grant of summary judgment in favor of MassMutual with regard to the Massachusetts common lawclaims of plaintiffs Binsky, Buck, Kennedy, Ziemba, and Faniel, butreverse the grant of summary judgment with regard to the state lawclaims of plaintiffs Rodowicz, Lemon, and Stevens. The cause isremanded for further proceedings consistent with this opinion.  So ordered. Each party to bear its own costs.