William MARTINEZ, Frank Ditta, and
Lafayette Kirksey, Plaintiffs

v.

SCHLUMBERGER LIMITED and
SCHLUMBERGER TECHNOLO-
GY CORPORATION, Defendants

No. CIV.A.H–00–2899.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 28, 2001.

Martin S. Shellist, Shellist Lore, et al,
Houston, TX, for plaintiffs.

Anthony P. Rosenstein, Baker & Botts,
Houston, TX, for defendant.

## MEMORANDUM AND ORDER

HARMON, District Judge.

The above referenced action was re-
moved from state court on the ground that

Plaintiffs William Martinez, Frank Ditta, and Lafayette Kirksey's state-law claims of fraud, fraudulent inducement, negligence, and gross negligence, arising from statements allegedly made concerning the Schlumberger 1998 Voluntary Cash Payment Plan, the Schlumberger Well Services Pension Plan, and the Schlumberger Well Services Savings and Profit Sharing Plan (collectively, "The Plans"), were preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, as amended.[1] Plaintiffs' original petition, still their controlling pleading, alleges that Schlumberger Technology Corporation defrauded Plaintiffs, who made express inquiries regarding future plan benefits before they retired, by denying that it was considering offering enhanced early retirement packages and advising Plaintiffs to take early retirement before June 30, 1998.[2] Plaintiffs also assert that Schlumberger Technology Corporation denied them interest on monies owed and ultimately paid untimely to them.

Pending before the Court is Defendants Schlumberger Limited and Schlumberger Technology Corporation's (collectively, "Schlumberger's") motion for summary judgment (instrument # 11).

## Standard of Review

The movant seeking a federal summary judgment initially must inform the court of the basis for its motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine issue of material fact and show that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the opposing party's claims nor produce evidence showing an absence of a genuine factual issue, but may rely on the absence of evidence to support essential elements of opposing party's claims. *International Assoc. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co.*, 812 F.2d 219, 222 (5th Cir.1987). The burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed.R.Civ.P. 56(c). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving par-

1. *Lee v. E.I. DuPont de Nemours & Co.*, 894 F.2d 755, 758 (5th Cir.1990) (affirming dismissal of plaintiff's ERISA-preempted state-law claims brought in the wake of a retirement incentive plan). In their response to the motion for summary judgment, Plaintiffs state that they do not contest the preemption of their state-law claims by ERISA. They also suggest that in light of their concession, there should be no need for them to re-plead to add an ERISA claim, but should the Court deem it necessary for them to do so, they request leave to amend.

2. On July 27, 1998, after Plaintiffs had retired in June of that year, Schlumberger an-

nounced it was offering an enhanced early retirement package to a group of employees that would have included Plaintiffs had they not retired. The new severance package provided *inter alia* an additional year of salary, which Plaintiffs did not receive. According to the original petition, which, despite preemption by ERISA, has not been repled under the federal statute, they seek to have Schlumberger "correct its misrepresentations and permit each to obtain the enhanced benefits," with interest, as well as damages for mental anguish and loss of enjoyment of life, and exemplary and punitive damages.

ty may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence and specific facts. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. He meets this burden only if he shows that "a reasonable jury could return a verdict for the non-moving party." *Id.* at 254, 106 S.Ct. 2505. A mere scintilla of evidence will not preclude granting of a motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505.

All reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538. 587–88 (1986), citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Once the burden of proof has shifted to the non-movant, he "must do more that simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. Instead he must produce evidence upon which a jury could reasonably base a verdict in his favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.,* 477 U.S. at 249–50, 106 S.Ct. 2505. Moreover the non-movant must "go beyond the pleadings and by his own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.,* 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions are not competent summary judgment evidence. *Grimes v. Texas Dept. of Mental Health and Mental Retardation,* 102 F.3d 137, 139–40 (5th Cir.1996); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130

L.Ed.2d 127 (1994); *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

Pleadings are not summary judgment evidence. *Wallace v. Texas Tech University,* 80 F.3d 1042, 1046 (5th Cir.1996), *citing Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*).

### Applicable Law

An ERISA plan participant or beneficiary may sue the plan administrator for breach of fiduciary duty and seek equitable relief. *See* 29 U.S.C. § 1109 ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable ...."); 29 U.S.C. § 1002(21)(A)("... a person is a fiduciary with respect to the plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation ...; or (iii) he has any discretionary authority or discretionary responsibility ... in the administration of such plan"); and 29 U.S.C. § 1104(a)(1)(A)(i)("Prudent man standard of care: ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—... for the exclusive purpose of ... providing benefits to participants and their beneficiaries ...."). Communications regarding likely future plan benefits are within the broad scope of the fiduciary's duty; a plan administrator has a fidu-

ciary duty not to make material misrepresentations about the availability of future plan benefits. *Varity Corp. v. Howe*, 516 U.S. 489, 505, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Where a plan fiduciary makes affirmative, material, untruthful misrepresentations to a plan participant or beneficiary about proposed future modifications to an employee benefit plan, the fiduciary may be sued for breach of his fiduciary duty. *Id.*

The threshold legal issue in this action is at what point the fiduciary duty of an ERISA plan administrator is triggered to disclose to a plan participant or beneficiary possible changes to an existing, or development of a new, severance plan that have/has not yet been formally adopted. There is a spectrum of positions staked out by the Circuit Courts of Appeals in resolving this question.

A majority of appellate courts have adopted variations of the "serious consideration" test, first articulated by the Eleventh Circuit, to identify the point at which a plan fiduciary's duty to disclose arises with respect to possible new ERISA plans or plan modifications under consideration by an employer acting as a plan administrator. *Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir.), *cert. denied*, 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991); *Hockett v. Sun Co., Inc.*, 109 F.3d 1515, 1522–25 (10th Cir.1997); *Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1048–49 (9th Cir.2000)(*en banc*); *Muse v. Int'l Bus. Machs. Corp.*, 103 F.3d 490, 495 (6th Cir.1996), *cert. denied*, 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997); *Wilson v. Southwestern Bell Tel. Co.*, 55 F.3d 399, 405 (8th Cir.1995); *Fischer v. Phila. Electric Co.*, 96 F.3d 1533, 1539 (3d Cir.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997), and *Vartanian v. Monsanto Co.*, 131 F.3d 264, 268 (1st Cir. 1997). Under the serious consideration test, a material misrepresentation about a future plan offering does not constitute a breach of fiduciary duty unless it is made after the employer has "seriously considered" the proposed offering. *Hockett*, 109 F.3d at 1522.

The purpose of the "serious consideration" test is to " 'balance the tension between an employee's right to information and an employer's need to operate on a day-to-day basis' " and thereby safeguard employee benefit plans while not dissuading employers from offering them. *Hockett*, 109 F.3d at 1522, *quoting Fischer*, 96 F.3d at 1539. According to the test, along the continuum stretching from "the most casual mention of a possible plan change" to "a formal vote by the Board of Directors," a fiduciary obligation to disclose a possible future benefit plan arises only when that proposed plan comes under "serious consideration" by the employer. *Id.* Thus before one can prevail on a claim for breach of fiduciary duty based on a misrepresentation by a plan administrator, the proposed plan must have been under "serious consideration" at the time that the alleged misrepresentation was made. *Id.*

The Third Circuit has established a three-factor framework to determine whether a plan is under "serious consideration": (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change. *Fischer*, 96 F.3d at 1539. All three factors must intersect before a misrepresentation about a future plan change may become material and constitute a breach of fiduciary duty. *Id.* at 1538. The first factor does not arise until the plan administrator has completed the preliminary steps of gathering information, developing strategies, and analyzing options. *Id.* at 1539–40. The specific proposal need not be in finished form, but must offer sufficiently concrete details to allow management to consider implemen-

tation of the plan. *Id.* at 1540. The second factor allows senior management to participate with other personnel and outside consultants in the preliminary steps without triggering the duty to disclose until they reach the stage of focusing on "practicalities of implementation." *Id.* The last factor restricts the second factor and makes recommendations by middle-level employees insufficient to trigger the fiduciary duty to disclose. *Id.* "Senior management" under the test refers to those who will ultimately make recommendations to the Board of Directors. *Id.* When all three factors coalesce, the plan has come under "serious consideration" and any material misrepresentation made by the plan administrator after this time constitutes a breach of its fiduciary duty. *Id.* The First Circuit in *Vartanian,* 131 F.3d at 268, 272,[3] the Tenth Circuit in *Hockett,* 109 F.3d at 1523,[4] and the' Ninth Circuit on rehearing in *Bins,* 220 F.3d at 1049, have in large part adopted *Fischer*'s test and applied it flexibly.

The Sixth Circuit applies a similar but slightly less stringent test and has concluded that "serious consideration" occurs when the employer company "focuses on a particular plan for a particular purpose." *Muse,* 103 F.3d at 494; *McAuley v. International Business Machines Corp., · Inc.,* 165 F.3d 1038, 1043 (6th Cir.1999). Thus there is no "serious consideration" when an employer is reviewing changes in plans "to gain a general appreciation of its options." *Id.* In *McAuley,* the Sixth Circuit also considered and applied the *Fischer* analysis. 165 F.3d at 1043–44, 1045. In *McAuley,* the panel, clarifying the holding in the Sixth Circuit's earlier opinion in *Muse,* stated that *Muse* did not require a "finalized plan in its ultimate incarnation." 165 F.3d at 1044. It found in *McAuley* that "the available evidence demonstrates fulfillment of the *Muse* test ... when the Management Committee, a group with the authority to approve the changes for implementation, considered plan options and directed personnel staff to proceed to a final design. Such consideration by a group with significant powers constitutes the company's 'focus' on a plan as required by *Muse.*" *Id.* at 1044–45.

Far less deferential to the employer's corporate interests, the Second Circuit has concluded that in an ERISA action alleging misrepresentation of future pension benefits, information is "material" if there is a substantial likelihood that the misrepresentation "would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *Ballone v. Eastman Kodak Co.,* 109

---

**3.** The First Circuit modified the first factor of *Fischer* by requiring that "a specific proposal which would affect a person in the position of the plaintiff." 131 F.3d at 272.

**4.** As its rationale for the test, the Tenth Circuit observes,

If *any* discussion by management regarding possible change in an ERISA plan triggered disclosure duties, the employer could be burdened with providing a constant, ever-changing stream of information to inquisitive plan participants..... And, most of such information actually would be useless, if not misleading, to employees, considering that many corporate ideas and strategies never reach maturity, or else metamorp-

hose so dramatically along the way that early disclosure would be of little value.... Furthermore, requiring employers to reveal too soon their internal deliberations to inquiring beneficiaries could seriously "impair the achievement of legitimate business goals" by allowing competitors to know that the employer is considering a labor reduction, a site-change, a merger, or some other strategic move.... Even more importantly, we believe the [*Fischer*] standard protects employees' access to material information without discouraging employers from improving their ERISA plans in the first place. [citations omitted]
*Id.* at 1533.

F.3d 117, 123 (2d Cir.1997). An ERISA fiduciary may not make "guarantees regarding future benefits that misrepresent present facts." *Id.* at 122. Diverging from its sister Circuits, the Second Circuit concluded that regardless of whether a specific plan is under serious consideration, an ERISA fiduciary "has a duty to deal fairly and honestly with its beneficiaries." *Id.* In other words, serious consideration "is not a prerequisite to materiality" and has no "talismanic significance," nor does it create a "bright-line rule." *Id.* Instead the Second Circuit considers a number of factors in analyzing the materiality of an employer's allegedly misleading statements in a fact-specific analysis, including "[h]ow significantly [the false] statement misrepresent[ed] the present status of internal deliberations regarding future plan changes, the special relationship of trust and confidence between a plan fiduciary and beneficiary, ... whether the employee was aware of other information or statements from the company tending to minimize the importance of the misrepresentation ..., and the specificity of the assurance." *Id.* at 125. It also found that external factors, such as a decline in the employer company's fortunes or the need to make an immediate benefit election, could make information provided by the employer material. *Id.* at 123.

In *Ballone,* Kodak purportedly revised its pension plan and encouraged employees to retire by assuring them that it had ruled out any further plan changes in the immediate future. *Id.* at 120–21. The following year Kodak reviewed its situation and authorized a re-revised pension plan providing greater benefits than the predecessor plan. *Id* at 125–26. It was undisputed that Kodak had not "seriously considered" offering the re-revised plan a year before when it had told employees considering retirement that it had ruled out such a plan change, but instead time had proved the statement to be a misrep-

resentation. *Id.* at 122. The Second Circuit nevertheless found that the district court had erred in granting summary judgment in favor of Kodak because "[w]here an ERISA fiduciary makes guarantees regarding future benefits that misrepresent present facts, the misrepresentations are material if they would induce a reasonable person to rely on them." *Id.* at 122. The Court emphasized,

> Regardless of whether the employer is seriously considering altering its retirement plan, the employer's false assurance that future enhancements have been ruled out for some specific period can be decisive in inducing an employee to hasten retirement, rather than delay in hope of receiving enhanced benefits. This aspect of the assurance can render it material regardless of whether future changes are under consideration at the time the misstatement is made.

*Id.* at 124. It remanded the case to the district court to consider whether, in view of the factors indicated *supra,* the misrepresentations were material and whether Plaintiffs' reliance on them was reasonable.

The Fifth Circuit commented that in *Ballone* the Second Circuit rejected using "serious consideration" as a "talismanic indicator," but instead viewed it as only one factor in the materiality inquiry. *McCall v. Burlington Northern/Santa Fe Co.,* 237 F.3d 506, 510–11, n. 2 (5th Cir.2000), *cert. denied,* —— U.S. ——, 122 S.Ct. 57, 151 L.Ed.2d 26 (2001). The Fifth Circuit also expressly declined the opportunity before it to adopt or reject the "serious consideration" test because it was not "properly presented since [i]t is undisputed, in this record that the [subsequent plan] was not conceived until several years after Plaintiffs made their decision to retire." *Id.* at 511 n. 2. In contrast, in the instant case the new severance package was formally announced less than a month after Plaintiffs' retired.

The Seventh Circuit, which has not yet addressed the serious consideration test, has held that the fiduciary duty to communicate complete, material information affecting the interests of plan beneficiaries exists even when the beneficiary does not ask for the information. *Anweiler v. American Electric Power Service Corp.*, 3 F.3d 986 (7th Cir.1993). *Cf. Bins*, 220 F.3d at 1053 ("If an employee makes an inquiry (or inquiries) about prospective plan changes, the employer's fiduciary duty is to respond completely and truthfully about the present state of affairs—that is, whether serious consideration has begun. The employer's duty does not extend to employees who do not inquire about potential plan changes, however. We hold, that absent such an inquiry, an ERISA fiduciary does not have an affirmative duty prior to final approval and general dissemination of plan changes to volunteer information to employees who have not specifically alerted the fiduciary to the fact that such information is material to them.").

■ Once this Court makes a legal determination of the point at which it thinks the Fifth Circuit would conclude that the fiduciary duty of disclosure arises, it must apply that rule to the facts here to determine whether Plaintiffs have raised a genuine issue of material fact about whether that fiduciary duty was triggered and breached before Plaintiffs retired. To be actionable, the fiduciary's statement must be an affirmative, material, untruthful misrepresentation of current facts, including those relating to the employer's intent, about future plan benefits. *Ballone*, 109 F.3d at 125; *McCall*, 61 F.Supp.2d at 568–69.

### Defendant's Motion for Summary Judgment

Defendants' motion for summary judgment argues that Plaintiffs' fraud and negligent misrepresentation fail as a matter of law because they are not cognizable with respect to employee welfare benefit plans governed by ERISA and because there is no summary judgment evidence that shows that the persons who responded to Plaintiffs' questions did not tell Plaintiffs the truth as they knew it, since such individuals did not know of any impending incentive or sweetener. Alternatively, Defendants attempt to demonstrate that Plaintiffs' claims fail as a matter of law under ERISA.

Defendants explain that the plan at issue, the Voluntary Early Retirement Plan ("VERP"), was under the most preliminary discussion in May and early June, 1998, when Plaintiffs claim to have made their inquiries. Defendants insist that the duty to disclose the plan upon inquiry did not arise until after Plaintiffs retired in June 1998. They argue that a rule requiring employers to announce mere discussions or analysis of a possible early retirement plan would result in employee disappointment or confusion if the plan were tabled and would thwart the goal of ERISA to encourage employers to sponsor benefit plans for their employees.

On July 27, 1998, Defendants announced they were offering VERP to a specified group of employees who met specified criteria as of July 1, 1998 and who were actively employed by Schlumberger as of July 27, 1998. Exs. 1 and 13 to Defendants' motion for summary judgment. Because Plaintiffs had retired nearly a month before that announcement was made, Defendants maintain that Plaintiffs were not eligible to be included within this incentive program.

With supporting documentary evidence, Defendants demonstrate that in May, 1998 they first investigated the possibility of offering a retirement incentive by performing research through the Segal Company ("Segal"), at the request of Manager of Benefit Plan Compliance Margaret Bai-

ley ("Bailey"). Ex. 2., Bailey Affidavit. The research involved various types of plans that might be implemented and identified additional issues for analysis. *Id.* Titling its research "Expense Implications for Early Retirement Window Plan," Segal also calculated the cost of six different approaches and developed additional calculations. Exs. 3 and 4. Bailey forwarded the calculations to Vice President of Personnel Pierre Bismuth ("Bismuth"), who had "second thoughts" about whether VERP was feasible for Schlumberger in view of the expense. Bismuth e-mail of May 26, 1998, Ex. 5.[5] Bailey, Director of Personnel Ken Rohner ("Rohner"), and Senior Advisor to the Vice President of Personnel Art Alexander ("Alexander") continued to pursue information relating to a possible early retirement plan even though they did not have the authority to approve such a plan. Bailey Affidavit, Ex. A; Alexander e-mail to Rohner of June 5, 1998, Ex. 7.

Schlumberger asserts that it continued to examine the issue. On July 7, 1998, Bismuth requested information about costs and possible incentives and asked Alexander to discuss the incentive plan with him at a meeting in Paris. July 7, 1998 e-mail, Ex. 8. On July 14, 1998, those who had been gathering the research met in Sugar Land, Texas with upper management: Rohner, Schlumberger Oilfield Services President Rex Ross, Alexander, inside counsel John Symington, Manager of Employee Services Jack Kluepfel, Manager of Employee Services Harry Love, and Area Controller Luis Mesa to develop a specific proposal for Bismuth's consideration. July 14, 1998 e-mail, Ex. 9 ("based upon a

meeting . . . on Tuesday, July 14, the attached plan is proposed for implementing an early retirement program . . . . [P]lease review this as quickly as possible and let us know whether this is acceptable"). This proposal was developed, forwarded to Schlumberger Oilfield Services President Rex Ross and to Bismuth, whose joint approval of the plan was required before it could be forwarded to the board of directors for final approval. Only after this process was completed were preliminary steps taken to implement VERP, including seeking a legal opinion on the benefits, determining who should be included, and developing statistics for official purposes. Ex. 12. VERP was announced on July 27, 1998, and its election window left open until September 10, 1998. Exs. 1 and 13.

Defendants urge the Court to conclude that only at the July 14, 1998 meeting was there a confluence of "serious consideration" factors, when a specific proposal was formulated and then forwarded to the executive level for final approval. July 14, 1998 e-mail, Ex. 9. *Vartanian,* 131 F.3d at 272; *Hockett,* 109 F.3d at 1523. Defendants acknowledge that the consideration and implementation of the plan were swift and aggressive, with announcement of VERP occurring only two weeks later. July 14, 1998 e-,ail, Ex. 9. Defendants emphasize that Plaintiffs' resulting suspicion, alone, however, is not sufficient to preclude summary judgment. Nor did statements made to Plaintiffs prior to July 14, 1998 by lower level employees that they lacked knowledge of any upcoming plan constitute a breach of fiduciary duty because the duty was not triggered until after Plaintiffs retired.[6]

---

**5.** Defendants interpret Bismuth's comment that he would "certainly" go with the least aggressive option but that "the cost makes me have second thoughts" as meaning "that if any plan was to be discussed, he would only contemplate the least expensive of the six

scenarios that were in play at that time." Defendants' Reply in support of their Motion for Summary Judgment n. 2, citing Bailey Dep. at 118–19, Ex. 1.

**6.** With supporting evidence, Defendants demonstrate that on June 3, 1998 Plaintiff Lafay-

Defendants observe that seven Circuits employ the "serious consideration" test to determine when a proposed retirement incentive plan must, upon inquiry from an employee, be disclosed, but the Fifth Circuit has not adopted or rejected the test. Defendants assert that "serious consideration" is a term of art that excludes mere rumination or research into possibilities. Moreover, "serious consideration" exists only when the people authorized to implement a plan are focused on a specific plan for the purpose of implementing it. Defendants argue that on the dates of all Plaintiffs' inquiries and even on their retirement dates, VERP was not yet under "serious consideration."

After they retired, Plaintiffs made claims for VERP benefits and after consideration, their claims were denied. Ex. 23. Plaintiffs now sue Schlumberger, alleging that Schlumberger employees gave fraudulent answers to Plaintiffs' inquiries. Defendants maintain that Plaintiffs' only basis for the suit is their suspicion that Schlumberger's managers must have known about VERP in the Spring of 1998 when Plaintiffs asked about it. Defendants insist that the summary judgment evidence demonstrates that this specula-tion is incorrect and that VERP was not recommended to appropriate executive decision makers until after Plaintiffs had retired.

Defendants maintain that Plaintiffs' claims should have been brought as a cause of action for breach of fiduciary duty under ERISA. *McCall v. Burlington Northern/Santa Fe Co.*, 61 F.Supp.2d 563, 568 (N.D.Tex.1999) (holding that the employer's statement that future severance package would not offer better benefits, which accurately indicated its intent at the time it was made, was not a material misrepresentation leading to a breach of fiduciary duty), *aff'd*, 237 F.3d 506, 510–11 & n. 2 (5th Cir.2000)("Providing information to beneficiaries about likely future plan benefits falls with ERISA's statutory definition of a fiduciary act"; declining to adopt or reject "serious consideration" test), *cert. denied*, —— U.S. ——, 122 S.Ct. 57, 151 L.Ed.2d 26 (2001). Moreover, even if the Court construes Plaintiffs' state-law claims as a breach of fiduciary duty claim under 29 U.S.C. § 1104(a)(1), Defendants insist that they are entitled to summary judgment as a matter of law.

ette Kirksey ("Kirksey") elected to retire at the end of that month, i.e., on June 30, 1998. Ex. 19. Kirksey claims that at least a month before, no later than May 30, 1998, he asked human resources employee Linda Clark whether an incentive would be offered, and she responded that she had not "heard anything about a package." Kirksey Dep. at 21, Ex. 22. On April 20, 1998 William Martinez ("Martinez") elected to retire, and his last day on the payroll was also June 30, 1998. Ex. 14. He claims that some time before his date of election, he asked Ruth Garay ("Garay") and Jim Larkin ("Larkin") if Schlumberger was offering a package. Martinez Dep., Ex. 20 at 21, 22, 28. Garay referred Martinez to Larkin, who allegedly said that "he hadn't heard of anything coming down." *Id.* at 21, 22. Plaintiff Frank Ditta ("Ditta") claims that he asked supervisor Bill-Nickerson ("Nicker-son"), manager Dave Malone ("Malone"), and Larkin in April or May, 1998 whether any incentive plan was being offered. Ditta Dep. at 21, 22, Ex. 21. Nickerson purportedly said that he had not heard of one, but that Ditta should speak to Personnel. *Id.* at 21. Malone reportedly also said that he had not heard of one and referred him to Larkin. When all three Plaintiffs talked to Larkin, in May 1998 at the latest, Ditta stated that Larkin's opinion was that no plan would be offered at that time because the company would lose too many good people. *Id.* at 22, 24. Ditta further claims that on some later, unspecified date before he signed his retirement papers on June 19, 1998, he made the same inquiry of human resources employee Mary Rogers, who also stated that she had not heard of any such plan. *Id.* at 24–25, 26; Ex. 16.

Since the Fifth Circuit had not yet decided whether to follow the "serious consideration" test, Defendants urge that a more reasonable rule would require employers to notify employees about a retirement incentive only after such a package has been irrevocably implemented. They argue that to require employees who have already made a purely voluntary decision to retire to be told to revoke that decision is contrary to the purpose of an incentive. It would also discourage employers from establishing such incentives or pension increases, contrary to ERISA's purpose. *Lee v. E.I. DuPont de Nemours & Co.*, 894 F.2d at 758. This Court observes that Defendants' proposed rule, while highly protective employers, ignores ERISA's stated purpose of protecting plan participants and beneficiaries.

For purposes of the motion, however, Defendants assume that Schlumberger has a duty to respond to a specific inquiry from an employee and to provide information concerning an incentive that has been proposed for implementation to senior executives with the power to implement it, even though the incentive has not been finally and irrevocably approved.

Finally, Plaintiffs' claim for unpaid or underpayment of interest under Schlumberger's profit sharing plan fails as a matter of law, according to Defendants, because Defendants' actions comply with the terms of the plan. The plan documents establish the procedure to be followed. Section 6.2A states that for employees to receive their benefits following the plan year in which they terminate employment (a "Normal Distribution"), the distribution will be made following the end of the Plan Year in which termination of employment occurred. Profit Sharing Plan Documents, Ex. 10. The Plan Year is the calendar year. *Id.* at Section 1.22. Ditta and Martinez terminated employment in 1998 and elected Normal Distributions, so their pay-ments were due after December 31, 1998. Section 6.3 A also provides that the amount of the payment will be the vested account balance at the end of the Plan Year in which the termination of employment occurred. Therefor no interest was due on distributions for the period between December 31, 1998 and the date of distribution.

Defendants insist that Ditta and Martinez were given detailed notice of the procedures and the anticipated payout date of March 31, 1999. Exs. 15 and 18. Both opted for this later payment, thus allowing them to receive a share of the 1998 company profits. Martinez Dep., Ex. 20 at 32–33; Ditta Dep., Ex. 21 at 34; Ditta election form, Ex. 17. The distribution of profits occurred only after the late January meeting of the board of directors, the allocation of contributions, and the account valuation process, as Schlumberger later advised Plaintiffs. Claim Denial Letter, Ex. 23. There is no dispute that distributions were made to Ditta and Martinez on April 9, 1999.

Because Schlumberger complied with 29 U.S.C. § 1104 in following the documents governing the plan and with Plaintiffs' directives and therefore, as a matter of law, did not breach their duties to Plaintiffs, Defendants insist they are entitled to summary judgment on the interest claim.

### Plaintiffs' Response

Plaintiffs first argue that since the Fifth Circuit "specifically refused to apply the 'serious consideration' test," this Court should adopt the analysis of the district court in *McCall*, which was "approved" by the Fifth Circuit. 61 F.Supp.2d at 568 a new plan or enhancement is under "serious consideration" when (1) specific proposals (2) are being discussed for purposes of implementation (3) by senior management with authority over the benefits, *aff'd* 237 F.3d 506. Bailey's affidavit dem-

onstrates that Schlumberger knew before June 1998 that there would be a reduction in force and that Schlumberger would offer an enhanced VERP to deal with it. Bailey Dep., Ex. A to Response, p. 13, 11. 1–24; p. 15, 11. 18–24. Bailey and Rohner put together specific proposals for consideration by Schlumberger. *Id.* at p. 11, 11. 7–14; p. 12, 11. 4–6. Bailey's deposition testimony also demonstrates that Bismuth was deeply involved in these matters from the start. *Id.* at p. 54, 11. 1–12; p. 59, 11. 6–24. Furthermore, in early to mid May, Segal quickly prepared several proposals for consideration by these three management officials to deal with the upcoming reduction in force, which would specifically affect only the oilfield plants, indicating that Schlumberger knew then which employees would be subject to termination. Ex. C, Segal letter dated May 13, 1998 to Bailey; Bailey Dep. at p. 50, 11. 17–18. By May 21, 1998, Segal had presented four proposals for serious consideration to Bailey. Ex. D, Segal letter to Bailey, dated May 21, 1998. The next day Bailey forwarded them to Bismuth. Ex. B, e-mail from Bailey to Bismuth, dated May 22, 1998. By May 26, 1998, Segal responded to Bailey's request for two more proposals. Ex. E, Segal letter to Bailey dated May 26, 1998. Bailey forwarded them to Bismuth the same day by e-mail, and Bismuth answered that very night at 11:42 p.m., stating that he "will certainly go with the least aggressive option as the numbers are high and the cost not unsignificant [*sic* ]." Ex. E, Segal letter to Bailey dated May 26, 2998; Ex. F, e-mail from Bailey to Bismuth dated May 26, 1998. Bismuth further stated that the cost of the enhancement gave him "second thoughts." Plaintiffs argue these comments indicate that Bismuth was seriously considering the proposals. They also emphasize that a plan does not have to be final, as VERP was after approval in July 1998, before requirements of disclosure attach. Defendants represent that Bailey also testified that in May and June Defendants were considering implementing a VERP and that she was asked to "review the process." When asked to confirm that Defendants were considering the proposed VERP, Defendants report that Bailey testified, "Why else would we look into it?." Ex. A at p. 88, 11. 5–9.[7] Plaintiffs further highlight Bailey's response of "yes" to the question whether it was clear by May 26, 1998 that "the company was investigating this VERP specifically to determine the cost impact on the company and to determine whether it could afford to do it at the present time." Ex. A at p. 91, 1. 21 through p. 92, 1. 16. In sum, Plaintiffs contend that the facts here "clearly establish that specific proposals were being discussed for purposes of implementation in May and June 1998" and that they have

---

7. The Court finds that Plaintiffs pull phrases out of context and twist the meaning of Bailey's answers. The following is the complete relevant portion of the testimony to which Plaintiffs refer.

Q. You wouldn't be asked to look at—
A. I'd be asked to look at the VERP.
Q. Right. And do you know sitting here today, Ms. Bailey, that you were asked to look at the benefit side of a VERP—
A. Correct.
Q. —because the company was considering implementing one? I mean, that's why they wanted you to look into it, right?

A. They were asking me to review that process, yes. Do I know whether or not the company was considering it? You know, there's that word. I hate to—I hate to answer that has that word in it unless you're going to tell me what you're going to specifically ask for considering. But if you're asking me, you know, were we considering it at the time they asked me to look into it? No, because we didn't have enough information to know what the process would be entailed in that.

Ex. A at p. 80, 11. 2–20.

met the first two prongs of the *McCall* test.

As for the third prong, highlighting Defendants' concession that "an employer has a duty to respond to inquiry from an employee and provide information concerning a pension increase or incentive that has been proposed for implementation to senior executives with the power to implement it, even though the increase or incentive has not been finally and irrevocably approved," Plaintiffs disagree with Defendants' interpretation of "senior executives with the power to implement it." *McCall* states that the specific proposals at issue need only be considered "by those members of senior management with responsibility for the benefits area of the business,

and who will ultimately make recommendations to the board regarding benefits operations." 237 F.3d at 511, *citing Fischer*, 96 F.3d at 1540. Plaintiffs argue that it is undisputed that Bailey, Rohner and Bismuth constituted the team with responsibility to analyze the implementation of the VERP [8] and disseminate the information about the VERP to Defendants' management. Ex. A, Bailey Dep. at p. 11, 11. 7–14, p. 12, 11. 4–6, p. 59, 11. 6–12. According to Bailey, the "final VERP" was presented by Rohner on July 14, 1998 to a group of managers, including Ross, approved at that meeting, and agreed to by Bismuth, who had been involved in its development since early May. Ex. A to Defendants' motion for summary judgment, Bailey's Affidavit at p. 2.[9] Plaintiffs maintain that

---

8. The Court finds that in their argument, Plaintiffs manipulate the word "implement" under the *Fischer* test, a term of art, to expand its meaning to encompass almost any work in researching, developing, and comparing options, as well as putting into effect a new or modified plan. The portion of Bailey's deposition cited by Plaintiffs reads as follows:

> Q. .... So, if the company in 1998 was interested in coming up with some type of an enhanced benefit plan or benefit plan change of some type, you were the person who would look into the *feasibility* of either creating or changing such a plan; is that correct?
> A. I or myself as part of a team would look into it, right.

Ex. A at p. 11, 11. 7–14 (emphasis added).

9. Again, Plaintiffs play with words and cut parts out of context to make Bailey's statements appear to satisfy their specific burden of proof. Bailey's affidavit at 1–2, with emphasis added by the Court, states,

> In May, June and July 1998, at the request of the Director of Personnel Pierre Bismuth, I *researched* the *possibility* of Schlumberger's developing a voluntary early retirement program ("VERP"). This research was done in order to understand *whether or not* an incentive plan was a *viable and cost effective option* for Schlumberger. Other Schlumberger employees assisted with the VERP research, but the ma-

jority of research relating to the necessary requirement for implementation and cost was completed by me.

> Neither a final VERP plan or a final recommendation was completed for presentation to *upper* management until July 14, 1998, when meeting was held .... *At this meeting, a more specific plan was then* formalized and approved by those in attendance and forwarded to Pierre Bismuth for final approval. Only the combined approval of Pierre Bismuth and Rex Ross was sufficient to approve such a plan and result in its recommendation to the board of directors.

> Before June 14, 1998, *my research was a preliminary investigation into the necessary requirements for implementation of an early retirement incentive program, and whether or not an incentive plan would be a viable option for Schlumberger and, if so, the nature of the potential plan; it is not Schlumberger's practice to share contingency plans such as these with line managers and others until we have some reasonable assurance that we will proceed with such plans....* Until July 14, 1998 and Pierre Bismuth's and Rex Ross's subsequent approval of the VERP, Schlumberger could very well have elected not to proceed with any plan at all.

> *Only after receiving approval from Pierre Bismuth and Rex Ross* did we proceed with developing the necessary documentation and communication and other *steps toward implementation of the VERP.* At no time did

Bailey, Rohner and Bismuth qualify as individuals having responsibility for the benefits area of Schlumberger and who ultimately made recommendations to the group who made, or themselves participated in the making of, the decision to adopt the 1998 VERP.

Furthermore Plaintiffs underline that "[p]roviding information to beneficiaries about likely future benefits falls within ERISA's statutory definition of a fiduciary act." *McCall,* 237 F.3d at 510, *citing Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). They charge that Defendants violated their fiduciary duty by not speaking truthfully to Plaintiffs about material matters relating to Schlumberger's employee benefit plans.

### Defendants' Reply

In their Reply at p. 1, Defendants complain that "Plaintiffs' response asks this Court to create new law that imposes a duty on employers to disclose *any* possibility that an early retirement plan might be offered," a law that would "contradict the established law of every circuit including this one, and would make such plans impracticable for employers." They charge Plaintiffs with also "recast[ing] the roles of Schlumberger managers and executives in order to assert that 'serious consideration' occurred much earlier at Schlumberger than it actually did." The contention that "serious consideration" means any consideration at all, even the first tentative investigation of the possibility of a plan, lacks legal authority and is impracticable and would subvert ERISA's goal of encouraging employers to create and implement employee benefit plans. Defendants insist, however, that the summary judgment evidence supports its motion for summary judgment. They also note that Plaintiffs did not respond to their argument regarding interest on profit sharing

plans, so summary judgment should also be granted on this claim.

Challenging Plaintiffs' argument that serious consideration occurred in May 1998 because Bailey "knew" that there would be a VERP, Plaintiffs point to the very testimony cited by Defendants to show that only a general reduction in force was contemplated at that time and that a VERP was merely one of several possible ways to implement such a reduction:

A. ... I think the process in that would be if we needed to do a reduction [in force], how would the reduction in force take place.

Q. Okay. Was there any discussion in 1998 that you were a part of that entailed either Pierre or Ken telling you that they thought there would need to be a reduction in light of the business slowdown that Schlumberger might be facing?

A. Yes, that would be a true statement.

Q. Okay. And that one way to deal with the reduction and to handle it as economically and efficiently as possible would be to have some type of early retirement program to deal with the employees who would be departing?

A. At some point it was considered, yes.

Ex. A at p. 13, ll. 10–24. Defendants insist that simple mention of a plan cannot equal "serious consideration" and that such speculations cannot create a duty to disclose under any circuit's standard. *See, e.g., Fischer,* 96 F.3d at 1539–40 (distinguishing "the antecedent steps of gathering information, developing strategies, and analyzing options" from a "specific proposal"); *Vartanian,* 131 F.3d at 272 (distinguishing preliminary cost estimates from specific proposals). Nor did Segal's re-

I or the research group that I was a part of have the authority to approve the plan be-

fore receiving executive-level review and approval.

search and its six alternative proposed plans constitute a specific plan analyzed for implementation. Common sense and legal authority demonstrate that Bismuth's reaction to the research ("the number[s] are high and the cost not unsignificant . . . again the cost makes me have second thoughts") could not conclude that serious consideration occurred at this point. *See Vartanian*, 131 F.3d at 272 ("[I]t is clear that no early retirement plan affecting Vartanian was under serious consideration . . . . [the President] had asked for an estimate of the cost that Monsanto would incur if 400 employee were laid off. . . . But these corporate ruminations . . . did not trigger any contemporaneous duty of disclosure."); *Fischer*, 96 F.3d at 1539–40.

Defendants, moreover, object to Plaintiffs' equation of Bailey's use of the word, "consideration," with "serious consideration." Defendants also contest Plaintiffs' characterization that the deposition testimony discussed by the Court in footnote 7 of the memorandum and order demonstrates that "specific proposals were being discussed for purposes of implementation in May and June 1998." Moreover, Defendants note that Plaintiffs attempt to confuse the everyday use of the word "consider" for the legal term of art, "serious consideration."

The similar blurring of the lines between managers' and executives' roles and responsibilities to argue that serious consideration occurred before Plaintiffs retired is also improper, insist Defendants. The "serious consideration" test does not contemplate that acts of managers with *any* authority over employees can trigger "serious consideration" and subsequent duty to disclose; instead these key decision makers must be "*those members of senior management with responsibility for the benefits area of the business, and who ultimately make recommendations to the Board*." *Vartanian*, 131 F.3d at 271. Furthermore, those persons must be dis-

cussing a specific proposal for purposes of implementation. The competent summary judgment evidence here demonstrates that the combined authority of Ross and Bismuth was necessary to approve a VERP before it could be forwarded to the board of directors for final approval. Bailey Affidavit at 2. That evidence reflects that Rose approved the plan formulated on July 14, 1998 and asked Bismuth to review it as quickly as possible. It is also undisputed that Ross and Bismuth did not approve the plan and focus on its implementation until after the July 14th Sugar Land meeting.

Nor, insist Plaintiffs, did Bismuth's request for information on cost trigger disclosure requirements. Even if Bismuth had the sole authority to approve a plan for forwarding to board of directors, his early involvement in developing information essential to weigh the possibility of establishing a VERP is the type of participation expected in *Fischer* and does not trigger a fiduciary duty to disclose. *Fischer*, 96 F.3d at 1540 ("a corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits. Preliminary stages may also require interaction among upper level management, company personnel, and outside consultants. These discussions are properly assigned to the preliminary stages of company deliberations.").

Defendants emphasize that Schlumberger does not dispute that once a fiduciary duty arises, the plan administrator must speak the truth. The issue here is at what point that duty arises, which is the objective of the serious consideration test. Before the fiduciary duty not to mislead arises, a company is entitled to determine whether a plan is appropriate and to decide the terms of the plan without disclosing to employees, for example, that it is

debating whether to offer a plan or to terminate employees. If exposed at the early stage, such discussions would be unseemly and bad for company morale, and the prospect of a company's being forced to disclose such considerations would likely lead to the stifling of plan development altogether. More importantly, urge Defendants, is that there is no law creating an independent duty separate and apart from the serious consideration test that gives rise to a fiduciary duty not to mislead employees about future plans.

### Court's Ruling

As the initial matter, this Court concludes that Plaintiffs' state law claims are preempted by ERISA and that they are asserting a claim for breach of fiduciary duty under 29 U.S.C. § 1104. In the interests of justice, the Court construes their cause of action as such, rather than requiring repleading.

Second, because Plaintiffs have not responded to Defendants' challenge to their claim for interest, the Court finds that they have not met their burden of proof on this issue. Meanwhile Defendants have demonstrated that they complied with the plan terms and with Plaintiffs' directives. The Court concludes that Defendants are entitled to summary judgment on this claim.

With respect to the heart of Plaintiffs' complaint, the alleged breach of fiduciary duty of disclosure of future ERISA plans, this Court opines that the Fifth Circuit would adopt some version of the majority rule, the serious consideration test. The Second Circuit approach, which reduces the test to only one factor and which appears to upset the balance between protecting the employee and the employer in favor of the former, appears to this Court not only to serve as a disincentive to development of employee benefit plans, but also to result generally in trial litigation be-

cause the fact-specific analysis is not likely to be resolved by summary judgment.

■ It appears to this Court that the competent summary judgment evidence in the record suggests that Schlumberger had the future plan under "serious consideration" by the presentation at the meeting on July 14, 1998. Up to that point, as reflected in the evidence, although the specific purpose of reducing the work force in the oil field plants had been identified, lower management, with the aid of outside consultant Segal, was still researching various possible plan options, as well as other means besides severance packages, and the laws impacting these choices, and submitting all that information for consideration. The Court agrees with Defendants that there is no evidence that Defendants had focused on a particular option for the purpose of implementation by senior management with authority over benefits prior to the Sugar Land meeting. While Bismuth may have been part of upper management, Bismuth's participation before that meeting has only been shown to involve the preliminary steps of surveying possibilities and obtaining cost analyses for comparison of the various options. Schlumberger has also shown that the approval and recommendation to the board of a specific plan by both Bismuth and Ross were required before discussions relating to implementation could commence.

Although Defendants have argued that they are not liable because the specific individuals whom Plaintiffs questioned prior to their retirement about the possibility of an upcoming new severance package did not make any misrepresentations because they did not know about the ongoing research and accurately stated that they did not know of any possible future changes, the Court finds such a contention untenable. Schlumberger cannot avoid a duty of disclosure by not informing lower manage-

ment individuals with whom Schlumberger knows its employees will discuss retirement options and whom it directs employees to contact when they are considering terminating their employment.

The only troubling fact here is the remarkably short time between the date of Plaintiffs' retirement, June 30, 1998, and the Sugar Land meeting and resulting decisions on July 14, 1998. When questioned about the timing however, the only response presented by Plaintiffs to demonstrate that the a particular plan was under serious consideration was pure speculation. During Martinez's deposition, the following colloquy took place:

Q. So it is just purely the timing of the whole thing that makes you think that somebody wasn't telling the truth?

A. I think somebody wasn't telling the truth.

Q. And why is that?

A. Because I can't believe that people—a company that big would just jump up and give, you know, that—I don't know how many, I think like 400 employees were offered or 500, and I just can't believe they just got that money out of the kitty and just paid all these people. So I know that, you know, that it had to be in the makings already.

Ex. 20 at p. 23, Defendants' motion for summary judgment. *See also* Dep. of Frank Ditta, Ex. 21 at p. 23 ("Because a company that size does not make an offer like they did overnight... I have no idea [how long it takes]. I know it took a month for us to get our paperwork ready. For over the 300 packages they sent out, I imagine it took quite a while."). Defendants have presented evidence that they were under economic pressure to effectuate a reduction in the work force quickly. The proximity between Plaintiffs' June 30, 1998 retirement and the July 14, 1998 meeting is insufficient, by itself, to preclude summary judgment. After prelimi-

nary investigation and comparisons were completed, Plaintiffs have failed to present any documentary evidence to raise a genuine issue of material fact for trial regarding when or how Schlumberger focused on a particular proposal and was discussing it for purposes of implementation prior to the July 14, 1998 meeting.

Accordingly, for the reasons explained above, the Court

ORDERS that Defendants' motion for summary judgment is GRANTED.

### FINAL SUMMARY JUDGMENT

Pursuant to the memorandum and order signed on this day, the Court

ORDERS that FINAL SUMMARY JUDGMENT on all claims is GRANTED in favor of Defendants Schlumberger Limited and Schlumberger Technology Corporation against Plaintiffs William Martinez, Frank Ditta, and Lafayette° Kirksey. Plaintiffs shall take nothing and shall bear all costs of court.

THIS IS A FINAL JUDGMENT.